UNITED STATES of America,
Plaintiff,

v.

NEW YORK, NEW HAVEN AND HART-
FORD RAILROAD COMPANY, Tri-
Continental Financial Corporation, A. C.
Allyn and Company, Incorporated,
American Transportation Enterprises,
Inc., Equitable Securities Corporation,
Carl M. Loeb, Rhoades & Co., Robinson-
Humphrey Company, Inc., and John W.
Clarke & Co., Defendants.

Helene GLENMORE et al., Plaintiffs,

v.

John I. AHERN et al., Defendants.

United States District Court
S. D. New York.

Feb. 17, 1959.

George Cochran Doub, Asst. Atty. Gen., Arthur H. Christy, U. S. Atty., for S. D. New York, New York City, for the United States.

Pomerantz, Levy & Haudek, New York City, for plaintiffs Helene Glenmore and others.

Cahill, Gordon, Reindel & Ohl, New York City, for defendants Tri-Continental Financial Corp. (in Civ. 140–42), A. C. Allyn & Co., Inc., American Transp. Enterprises, Inc., Equitable Securities Corp., Carl M. Loeb, Rhoades & Co., Robinson-Humphrey Company, Inc., and John W. Clarke & Co.

Percival E. Jackson, New York City, for defendant Tri-Continental Financial Corp. in Civ. 107–132.

### Opinion and Order

McGOHEY, District Judge.

Three motions in the Government's suit and two in the Glenmore suit are here considered. They are as follows.

In the Government's suit all defendants, other than New Haven, moved under Rule 12(b), Fed.R.Civ.P. 28 U.S.C. for dismissal of the complaint on the ground that it fails to state a relievable claim; or, in the alternative, for judgment on the pleadings under Rule 12(c). The Government cross moved first for a preliminary injunction and later for summary judgment under Rule 56(a).

In the Glenmore suit the plaintiffs moved for partial summary judgment on the "sixth count" of their complaint. The defendant Tri-Continental Financial Corporation cross moved under Rule 12 (c) for judgment on the pleadings on the "sixth count."

Matters outside the pleadings were offered in affidavits and considered. Accordingly the motions under Rule 12(b) and 12(c) have been considered as motions for summary judgment under Rule 56. The five motions were argued together.

All parties agree and I independently find that no genuine issue as to any material fact is raised on any of the motions. Decision of each turns solely on the following question of law: whether a written agreement entered into in November, 1955 and amended in April, 1956, between New Haven and a group of bankers, in which New Haven made a contingent commitment to buy 131,385 of its preferred shares from the banking group in December, 1959, is illegal and void because it lacks prior authorization by the Commission pursuant to Section 20a of the Interstate Commerce Act.[1] For the reasons hereafter stated, I hold it is not.

The banking group consists of all the defendants, other than New Haven, named in the Government's suit. They acquired the shares by purchase from their then owners, of whom New Haven was not one, at or about the date of the challenged agreement, under circumstances hereafter related.

The Government suit seeks judgment declaring the agreement illegal and void for lack of compliance with Section 20a; and a permanent injunction restraining New Haven from carrying out or giving any effect to it. It also seeks to enjoin the members of the banking group *pendente lite* from assigning or transferring any of the shares which are subject to the challenged agreement except on order of the court.

The Glenmore suit is a derivative action by New Haven stockholders against a large number of defendants including the members of the banking group. The amended complaint is in multiple "counts" of which only the sixth is here involved. That "count" is based on the alleged illegality, for lack of compliance with Section 20a, of the agreement involved in the Government's suit.

The banking group acquired the shares and entered into the challenged agreement under the following circumstances. In the summer and early fall of 1955, New Haven's properties sustained extensive hurricane and flood damage which it was estimated would cost several

1. 49 U.S.C.A. § 20a.

million dollars to repair. A loan of $10 million, to be guaranteed by the Government, was negotiated but could not be consummated until authorized by the holders of the amount and class of stock required by New Haven's charter. The holders of 131,385 preferred shares, whose votes were required for approval of the proposed loan, opposed it except upon conditions which New Haven's management was unwilling to approve and recommend to the holders of the common stock. The management thereupon arranged with the banking group to purchase the 131,385 preferred shares at $60 per share. As part of this arrangement the challenged agreement was made with the banking group. The proposed loan was thereafter approved by New Haven's stockholders and, having been guaranteed by the Government, was consummated. In 1956 an additional Government guaranteed loan of $6 million was made. Both loans, upon New Haven's application, were authorized by the Commission.

The challenged agreement originally provided that the banking group had the right to call upon New Haven, in December, 1957, to buy all the shares at $70 per share; and New Haven had the right to call upon the banking group, in December, 1957, to sell all the shares to New Haven at the same price. The 1956 amendment extended the terminal date to December, 1959 and increased the price to $75 per share. During the life of the agreement the banking group may not sell any of the shares to others without giving New Haven opportunity to buy at the price offered by others. And if any shares are sold to others at a price higher than $75 per share, the banking group is obligated to pay the excess to New Haven.

The statute makes "unlawful" the issuance by a carrier of "any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier * * * unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission * * * the commission by order authorizes such [issuance]." It is conceded that New Haven made no application for authority to enter into the challenged agreement; and that the Commission made no order authorizing it to do so. However, there was no secret about the making of the agreement. It was, of course, disclosed to New Haven's stockholders in notices and financial statements; and to the Secretary of the Treasury who, on behalf of the United States, guaranteed both loans. But what is most significant here is that it was promptly disclosed to officials of the Commission and to the Commission itself.

█ Among the documents submitted on the motions and considered by me, were the affidavit of William T. Griffin, Esq., Special Counsel to New Haven, and the Commission's "reply" thereto.[2] Neither controverts the other and neither has been controverted in any respect by the other parties to the suits. Accordingly the facts alleged in each are taken as conceded by all parties in both suits.[3] Those facts are as follows.

On November 29, 1955, at the Commission's office in Washington, D. C., Mr. Griffin and New Haven's treasurer conferred concerning the first loan with Commissioner J. Monroe Johnson, then Chairman of the Commission's Division 4 which has jurisdiction over matters arising under Section 20a, and Mr. Roger T. Boyden, then Director of the Commission's Bureau of Finance which also has

2. New Haven did not join in any of the present motions. The Griffin affidavit was offered to inform the Court of the facts alleged therein, for such weight as the Court might think appropriate. The Commission's "reply" is entitled "Certificate and Statement." Though not sworn to, it is signed by Harold D. Mc-Coy in his official capacity as Secretary of the Commission, and under its seal. It has been accorded here the status of a statement under oath.

3. See United States Trust Co. of New York v. Sears, D.C., 29 F.Supp. 643, 645.

some subordinate jurisdiction over such matters. The making of the challenged agreement in the circumstances above described was fully disclosed to these Commission officials and copies of the agreement were given to them. They were informed, moreover, that New Haven's counsel was of the opinion that the agreement was not within the purview of Section 20a and that accordingly New Haven did not propose to apply for Commission approval pursuant to that section. The Commission thereafter authorized New Haven to consummate the $10 million loan.

On March 13, 1956, the Commission issued a "press release" announcing that it "will institute an inquiry concerning [the challenged agreement] and certain accounting practices of the carrier to determine whether there has been any violation of the Commission's regulations or of the statutes administered by it, or any practices indulged in which are contrary to the best interests of the carrier or the public." The investigation was begun on March 19, 1956, by the Commission's Bureau of Accounts, Cost Finding and Valuation. How the investigation proceeded, what, if anything, it developed, when, if ever, it was concluded and what, if any, action the Commission took as a result of it, do not appear. Specifically, and significantly, it does not appear in any document before me nor was it contended in argument or briefs, that the instant Government suit was commenced pursuant to any order of the Commission, based on that or any other investigation, holding the challenged agreement invalid.[4]

The Commission's records disclose no Commission action "formal or informal" approving the challenged agreement or holding it exempt from Section 20a. On the other hand, there has not been produced and it is not contended that there exists any record disclosing any Commission action "formal or informal" disapproving the challenged agreement or holding it to be subject to Section 20a.

It does not appear whether in any report or order authorizing the 1955 loan, the Commission noted the existence of the challenged agreement. However, in its Report dated August 6, 1956, approving the second loan of $6 million, the Commission specifically noted that the consummation of that loan was a "condition precedent to the extension for two years of [New Haven's] contingent commitment to purchase certain shares of its preferred stock." The challenged agreement was further disclosed to the Commission in applications for authority to make other loans for other purposes; and also in annual reports filed with the Commission in 1956 and 1957.

It is not contended by any of the moving defendants that New Haven's disclosures to the Commission constituted an "application" under Section 20a for authority to make the challenged agreement; or that Commission "authorization" resulted from the Commission's failure to challenge the agreement at the times it approved the loans or indeed at any time prior to November 1958.[5]

Neither is it contended that the Commission's failure for three years to challenge the agreement, estops the Government from challenging it as illegal now.

4. Although not alleged in any of the Government's papers, it is assumed the instant Government suit was commenced by the Attorney General and the United States Attorney for this district, only upon the Commission's request as required by the statute. 49 U.S.C.A. § 12 (1).

5. The Commission's first attack on the challenged agreement was made in the instant complaint which was not filed until November 17, 1958, three years after the agreement and the first loan were made and two and a half years after the agreement had been noted specifically by the Commission in its Report authorizing the second loan in 1956.

The Glenmore suit was filed on February 17, 1956. The original complaint was in the usual form in stockholders' suits. It made no charge that the challenged agreement was illegal for lack of Commission approval under § 20a. That charge was first made in the "sixth count" of the amended complaint filed on June 11, 1957.

The moving defendants contend, rather, that the Commission's inaction for so long a time despite full knowledge of the facts, shows that the challenged agreement is not within the purview of Section 20a as construed and applied by the Commission since 1920 when the section was enacted. I agree.

■■ Throughout the 38 years since the section was enacted the Commission had consistently construed and applied it as not governing agreements, regardless of the amount involved, which do not also involve (a) the issuance of capital stock, promissory notes or bonds, or (b) the actual amendment of issued stock certificates, notes or bonds themselves.[6] The strictness with which the Commission has adhered to this construction is exemplified by its ruling in Fonda, Johnstown and Gloversville Railroad Company Bonds.[7] In that case the carrier made formal application under Section 20a for authority to do two things: *first,* to enter into an agreement with the trustee and bondholders under a corporate mortgage providing for a proposed amendment of the terms of the bonds as to interest; *second,* to amend the terms stated in each bond by stamping on each a "legend" reciting that the original interest rate of 4½% was reduced to 2%. The Commission took jurisdiction of the application for authority actually to alter the text of the bonds by stamping thereon the legend and granted authority to do so. It dismissed, however, that part of the application which sought authority to enter into the agreement, for the reason that, "the execution of the agreement providing for the proposed amendment * * * would not constitute an issue of securities coming within the limitations of Section 20a." The execution of the agreement here challenged clearly does not constitute an "issue" of any capital stock or notes or bonds any more than the agreement in the Fonda case. Moreover, here, the stock certificates themselves were not to be, and have not been, amended or altered in any respect. Accordingly the challenged agreement can be held illegal for lack of Commission. approval, only by overruling the Commission's settled construction of Section 20a. Courts are not free to do this except for cogent reasons.[8] The Commission's silence and inaction for three years shows it found no such reasons, and nothing not before the Commission appears in the papers before me. It is well established that administrative interpretation of a statute long adhered to carries great weight.[9] And this is peculiarly so when, as here, the interpretation is based on "contemporaneous construction * * *' by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."[10]

■ The failure to assert power "by those who presumably would be alert to exercise it * * * is equally significant in determining whether such power was actually conferred."[11] Not only has the Commission never asserted the power which is now claimed under Section 20a,

---

6. See, for example, Application of Louisiana Railway and Navigation Co., etc., 67 I.C.C. 808; Application of Grand Trunk and Western Railway Co., etc., 70 I.C.C. 554; Lehigh Valley Railroad Co., etc., 233 I.C.C. 359. In the latter case, the full Commission sat. In its report it reviewed the earlier decisions and ruled in accordance with all but a single contrary ruling by a single division of the Commission. It thus, in effect, clearly rejected the latter.

7. 180 I.C.C. 249.

8. United States v. Chicago, North Shore & M. Railroad Co., 288 U.S. 1, 13, 53 S.Ct. 245, 77 L.Ed. 583.

9. United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Chicago, North Shore & M. Railroad Co., supra.

10. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796.

11. Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 352, 61 S.Ct. 580, 582, 85 L.Ed. 881. See also Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 513, 69 S. Ct. 1251, 93 L.Ed. 1499.

but on the contrary it has expressly disclaimed the possession of such power, as its decisions show. Moreover, it has repeatedly asked Congress to enlarge its power under Section 20a to cover agreements like that in issue here which, though involving expenditures of large sums by a carrier, do not involve the "issuance" of its notes, bonds or stock.[12] Despite these repeated requests, Congress has not amended Section 20a. In these circumstances, the court will not, by a construction contradictory of the Commission's settled interpretation of the section, undertake to grant the Commission power which Congress has refused.[13]

It is clear from the foregoing that no grounds exist for granting the preliminary injunction sought in the Government's suit.

It is ordered as follows:

(a) *In the Government's suit:*

(1) The motion for preliminary injunction is denied.

(2) The Government's motion for summary judgment in its favor is denied.

(3) Summary judgment in favor of the moving defendants dismissing the complaint is granted.

(b) *In the Glenmore suit:*

(1) The plaintiffs' motion for summary judgment in its favor on the "sixth count" of the complaint is denied.

(2) Summary judgment in favor of Tri-Continental Financial Corporation dismissing the "sixth count" of the complaint is granted.

### Memorandum and Order

The order entered herein today granting summary judgment dismissing the "sixth count" of the complaint in the Glenmore suit, leaves undetermined the remaining "counts" pleaded in the complaint. There is, however, no just reason for delay in entering final judgment dismissing the "sixth count."

Accordingly, entry of such judgment is herewith ordered.

---

12. See 51 I.C.C.Ann.Rep. 105 (1937); 57 I.C.C.Ann.Rep. 132–133 (1942–43); 58 I.C.C.Ann.Rep. 105 (1943–44); 66 I.C.C.Ann.Rep. 147 (1951–52); 67 I.C.C. Ann.Rep. 147 (1952–53); 68 I.C.C.Ann. Rep. 128 (1953–54); 69 I.C.C.Ann.Rep. 124 (1954–55).

13. Alstate Construction Co. v. Durkin, 345 U.S. 13, 17, 73 S.Ct. 565, 97 L.Ed. 745; United States v. Chicago, North Shore & M. Railroad, supra.