**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**NEW YORK, NEW HAVEN AND HART-
FORD RAILROAD COMPANY, Tri-
Continental Financial Corporation, A.
C. Allyn and Company, Incorporated,
American Transportation Enterprises,
Inc., Equitable Securities Corporation,
Carl M. Loeb, Rhoades & Co., The Rob-
inson-Humphrey Company, Inc., and
John W. Clarke & Co., Defendants-Ap-
pellees.**

No. 109, Docket 25793.

United States Court of Appeals
Second Circuit.

Argued Oct. 6, 1959.

Decided Nov. 2, 1959.

Rehearing Denied Dec. 2, 1959.

On Suggestion of Lack of Appellate
Jurisdiction, Jan. 29, 1960.

**Helene GLENMORE et al., Plaintiffs-
Appellants,**

v.

**John I. AHERN et al., Defendants-
Appellees.**

Docket 25879.

Jan. 29, 1960.

Application for Hearing In Banc Denied
March 23, 1960.

WATERMAN, J., dissented in Glenmore et al. v. Ahern et al.

CLARK and WATERMAN, JJ., dissented from denial of application for hearing in banc in Glenmore et al. v. Ahern et al.

George Cochran Doub, Asst. Atty. Gen., and Morton Hollander, Peter H. Schiff, Attys., Department of Justice, Washington, D. C. (S. Hazard Gillespie, Jr., U. S. Atty. New York City, Peter H. Schiff, Robert W. Ginnane, and Harvard R. Osmond, Washington, D. C., on the brief), for plaintiff-appellant in Docket 25793.

Mathias F. Correa, New York City (James A. Fowler, Jr., J. Bernard Quigley, H. Richard Schumacher and Cahill, Gordon, Reindel & Ohl, New York City on the brief), for defendants-appellees Tri-Continental Financial Corporation et al in Docket 25793, and for defendant-appellee Tri-Continental Financial Corporation in Docket 25879.

Julius Levy, New York City (Irving Bizar and Pomerantz Levy & Haudek, New York City, on the brief), for plaintiffs-stockholders in Glenmore et al. v. Ahern et al., as amicus curiae in Docket 25793 and for plaintiffs-appellants in Docket 25879.

William T. Griffin, New York City, submitted a brief for defendant-appellee, New York, New Haven & Hartford R. Co.

Before LUMBARD, WATERMAN and FRIENDLY, Circuit Judges.

Opinion of November 2, 1959, on the merits in Docket 25793.

FRIENDLY, Circuit Judge.

The question here is whether a railroad subject to § 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, can lawfully provide by agreement for significant changes in the rights and privileges of holders of 27% of its preferred stock without having obtained authorization from the Interstate Commerce Com-

**528**

mission under § 20a(2).[1] We hold it cannot.

The question arises as follows: In August and October, 1955, the New York, New Haven & Hartford Railroad Company sustained extensive hurricane and flood damage. In an effort to raise funds required for repairs the New Haven management sought a $10,000,000 bank loan, which was to be guaranteed by the United States pursuant to § 302 of the Defense Production Act of 1950, 64 Stat. 798, 801, as amended, 50 U.S.C.A.Appendix, § 2092. The New Haven's charter required that such a loan be approved by the affirmative vote of two-thirds of the shares of its preferred stock considered as one class and of a majority of all the preferred and common shares considered as another. The management gave notice of a special meeting of the New Haven's stockholders to vote such approval.

After the notice was mailed, Amoskeag Company and the Dumaine family, owning 76,570 of the 491,540 shares of preferred, asked that the stockholders' approval be conditioned upon a proviso that the New Haven should not declare or pay any dividend on its common stock so long as the proposed loan remained unpaid. The New Haven's management then abandoned the proposed special meeting. It did this on the basis of a professed belief that Amoskeag, the Dumaine family, and other holders of preferred who normally voted with them could block the needed two-thirds vote of the preferred if the proviso were not included and that the needed majority vote of the preferred and common considered as one class could not be attained if it were.

The New Haven management thereupon entered into negotiations with a banking group to have the latter acquire the preferred shares owned by Amoskeag, the Dumaine family and others allied with them. These negotiations led to an agreement, dated November 10, 1955, between the New Haven and Union Securities Corporation on behalf of the banking group. The agreement provided that the banking group would purchase from specified sellers not less than 120,-000 nor more than 140,000 shares of New Haven preferred stock at a price ultimately fixed at $60 per share. The New Haven agreed that it would declare a $5 dividend for 1955 on the preferred not later than April 1, 1956, and that the purchasers should have the right to sell, or, in the language of the market, to "put" to the New Haven on and after November 18, 1957, and prior to December 18, 1957, all of the preferred stock purchased by them, less any stock sold in accordance with the agreement, at a price $10 above the purchase price. During the same period the New Haven could "call" on the purchasers to sell the stock to the New Haven at the same price. The "put" to the New Haven was buttressed by a provision that if "for any reason such right should not, in the opinion of counsel for the Purchasers, be immediately enforceable in accordance with its terms, or if, for any reason, the New Haven shall fail to purchase the Preferred Stock," the purchasers might sell the stock and hold the New Haven liable for the difference between the agreed repurchase price and what was realized. The purchasers also agreed that prior to November 18, 1957, they would not sell any of the preferred stock

1. This section, so far as material, provides:

"It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption."

without the approval of the New Haven, and that if they sold any of it at such prices that the net proceeds exceeded the amount payable by the New Haven under its "call," they would pay such excess to the New Haven.

The agreement was consummated on November 18, 1955. The seven members of the banking group purchased 131,385 shares of the New Haven's preferred stock at $60 per share. They received "stock certificates registered in the names of the several purchasers" bearing specified certificate numbers. And the New Haven delivered to Union Securities on behalf of the group an instrument granting the "put" relating to these specific shares required by the November 10 agreement and providing that all other provisions of that agreement should continue in full force and effect.

The New Haven then gave another notice of a special meeting of stockholders to vote on the proposed $10,000,000 loan. The proxy statement disclosed the facts summarized above. The necessary stockholder approval was given, and the loan was made with authorization of the Interstate Commerce Commission.

By the spring of 1956 it had become apparent that the New Haven required additional funds to repair the flood damage. As a condition to securing an additional loan the New Haven was required to and did obtain a modification of the agreement with the banking group. This modification included a waiver of the New Haven's obligation to pay a $5 dividend on its preferred stock for 1955; a two-year postponement of the period of the put; [2] a change so that both the put and the call should apply to all or any part of the total amount of stock held by the group; an acceleration of one year in the period for the call; and a provision that if the put or call should be exercised after repayment of the proposed loan and prior to payment of the $5 dividend for 1955, the put or call price should be $75 rather than $70 per share.

The New Haven did not seek authorization of the Interstate Commerce Commission to enter into these agreements. However, on November 29, 1955, the New Haven's Vice President-Treasurer, its Vice President-Law, and another attorney conferred with the chairman of the Interstate Commerce Commission's Finance Division and the Director of the Commission's Bureau of Finance with respect to the proposed $10,000,000 loan. The agreements between the New Haven and the banking group were disclosed to the Commission officials and copies were given them. The Vice President-Law informed them that the New Haven did not intend to apply for Commission approval of the agreements under § 20a because he did not think it was required, that for this reason he was not filing the contracts officially, but that the New Haven desired the Commission to know about the transaction.

On March 13, 1956, the Commission issued a press release announcing that it would "institute an inquiry concerning agreements entered into recently by the New York, New Haven & Hartford Railroad Company whereby it undertook to repurchase certain of its outstanding securities, and concerning the accounting practices of that carrier to determine whether there has been any violation of the Commission's regulations or of the statutes administered by it, or any practices indulged in which are contrary to the best interests of the carrier or of the public." The record is not very informative as to the course of this "inquiry." Apparently no docket number was assigned, no hearings were held, no briefs filed or arguments made, and the

---

2. The additional loan, initially $4,500,000, was evidenced by short-term notes maturing August 25, 1956. Later the loan was increased to $6,000,000, and made subject to Section 302 of the Defense Production Act of 1950, supra. Both the $6,000,000 loan and the $10,000,000 loan required principal payments of $500,000 each on December 30, 1957 and 1958. A two-year postponement of the "put" thus meant that $2,000,000 of the loans would become repayable before the "put" of the preferred stock could be made.

inquiry was concluded without order of any sort. Our best information regarding it comes from the Commission's report in New York, New Haven & Hartford R. R. Loan Guarantee, 307 I.C.C. 105, 112 (1959). This states that the inquiry revealed certain accounting irregularities for the years 1954, 1955, and 1956; that these irregularities were corrected through administrative action taken by the Commission; that the new management took steps to comply with the Commission's accounting regulations in the future; and that "The aforementioned informal inquiry was closed late in 1956."[3]

On November 17, 1958, the United States, suing on behalf of the Interstate Commerce Commission pursuant to 49 U.S.C.A. § 12(1), brought this action in the Southern District of New York. It sought a declaratory judgment that the agreement between the New Haven and the banking group with respect to the preferred stock was unlawful and void, since authorization by the Commission under § 20a(2) of the Interstate Commerce Act was required and had not been obtained, and a decree enjoining the defendants from carrying it out. The New Haven did not defend, and our references to "defendants" or "appellees" will relate to the banking group.

The defendants moved to dismiss the complaint under F.R. 12(b) or in the alternative to enter judgment on the pleadings under F.R. 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The government countered with motions for a preliminary injunction and for summary judgment, these being supported by certificates and statements from the Secretary of the Commission. The New Haven submitted affidavits setting forth the November 29, 1955, conference with the Commission officials and annex-

ing the report of the Commission cited above in the margin (Footnote 3). Considering the defendants' motions as for summary judgment, the Court (McGohey, J.), in a brief opinion, granted the motions of defendants and denied those of the government. Later the Court entered the judgment embodying this action and dismissing the complaint from which this appeal is taken. While the problem is difficult and the case one of first impression, we have concluded that the District Court was in error and that the government is entitled to the relief sought.

On brief the government based its case in part on a claim that the agreement between the New Haven and the banking group constituted an "evidence of * * * indebtedness." The government did not press this contention in argument. We think it was wise in not doing so. For "indebtedness is merely the state of being in debt" and debt "means a sum of money due by certain and express agreement [citations] and does not include liabilities which are contingent in that it is uncertain as to whether anything will ever be demandable under the contract." Sharpe v. First National Bank, 1936, 220 Wis. 506, 264 N.W. 245, 247. Moreover, as developed below, the Commission has held that an evidence of indebtedness is not within § 20a(2) unless it is in transferable form.

In order to prevail, therefore, the government must show that the transaction here under attack came within the provision of § 20a(2) requiring Commission approval "for any carrier to issue any share of capital stock."

The New Haven did not here "issue" additional preferred stock in the sense in which "issue" is used in corporation law. The preferred stock was issued in 1947, pursuant to authorization

---

3. During the pendency of the inquiry, the Commission issued its report in New York, New Haven & Hartford Securities, Finance Docket No. 19416, Aug. 6, 1956, approving issuance of a substituted note for the $10,000,000 borrowed in 1955 and an additional note of $6,000,000 rep-

resenting the additional loan discussed above. This report stated that procurement of the additional loan was a condition precedent to the extension by the New Haven "for 2 years of its contingent commitment to purchase certain shares of its preferred stock * * *".

granted by the Commission, 267 I.C.C. 867. However, it is far too late to argue that amendments of the terms of stock, bonds or notes, which are not "issues" in the corporation law sense, are not "issues" within § 20a(2). From the enactment of § 20a in 1920, the Commission has repeatedly asserted jurisdiction over changes in the terms of securities already "issued." The Commission's decisions to this effect are legion, and the series is unbroken. Among the changes in the terms of securities which the Commission has considered to be within § 20a(2) are extensions of maturity dates of notes and bonds,[4] changes of interest rates on bonds and notes,[5] and changes in the dividend rate of preferred stock.[6] The reasons behind this settled construction are obvious. The difference between a change in the terms of an outstanding security and its retirement and reissue is largely formal; and Congress could not have intended the Commission to be placed in a position where securities that the Commission had authorized on the basis of particular terms and conditions could be changed into quite different ones without its approval. Relying in part on "the long settled practice of the [Interstate Commerce] Commission in upholding its jurisdiction over securities, the maturity of which is extended," this Court has sustained a decision of the Securities and Exchange Commission that an extension of "investment certificates" of a public utility holding company was within § 6(a) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79f(a), making it unlawful for any registered holding company to "issue or sell any security of such company" except in accordance with a declaration and order under § 7 (15 U.S.C.A. § 79g). The Court said that "To treat the proposed arrangement as beyond the jurisdiction of the Securities and Exchange Commission would seem to place form above substance and to defeat the statutory purpose of safeguarding the public interest by affording the means of investigating the merits of such transactions by the Commission so that issues of securities may be stopped if found inexpedient for the securityholders." SEC v. Associated Gas & Electric Co., 2 Cir., 1938, 99 F.2d 795, 797, 798. Appellees do not succeed in distinguishing Associated Gas on the basis of the broader definition of "security" in § 2(a) (16) of the Holding Company Act, 15 U.S.C.A. § 79b(a) (16); for there the question was not whether the certificates were a "security" but whether their extension was an "issue or sale."

Indeed, appellees do not seriously question that if the same rights conferred upon them by the various agreements had been conferred upon all the preferred stockholders as a result of amendment of the New Haven's charter, authorization by the Commission under § 20a would have been required.[7] In our view, however, the applicability of § 20a(2) to a substantial change in the rights and ob-

---

4. Bonds of Erie R.R., 65 I.C.C. 131 (1920), Notes of Union Terminal Co., 65 I.C.C. 286 (1920), Securities of Waco B., T., & S. Ry., 90 I.C.C. 181 (1924), Bonds of Iron Mountain R.R. of Memphis, 131 I.C.C. 589 (1927), Bonds of Statesboro Northern Ry., 154 I.C.C. 635 (1929).

5. Notes of Trans Mississippi Terminal R.R., 65 I.C.C. 450 (1920), Bonds of Lancaster & Chester Ry., 70 I.C.C. 280 (1921), Securities of Cadiz R.R., 71 I.C.C. 311 (1922), Bonds of Northern Central Ry., 124 I.C.C. 253 (1927).

6. Increase in Dividend Rate on Preferred Stock by Virginian Ry., 72 I.C.C. 473 (1922), Consolidated Freight Lines, Inc. —Stock, 5 M.C.C. 749 (1938).

7. This is a sufficient answer to the argument, which, indeed, has not been vigorously advanced, that because of the clause in § 20(a) (2) forbidding a carrier "to assume any obligation or liability * * in respect of the securities of any other person" without Commission approval, the statute cannot be read to forbid a carrier to assume additional obligations with respect to its own. For if "issue" includes amendment, as the settled administrative construction has been, there is no need for further prohibition on a carrier's assuming obligations with respect to its own stock, bonds or notes.

ligations of a carrier and its stockholders does not depend on the particular method employed to effect the change. If the New Haven had invited preferred stockholders to accept new terms and to evidence their assent by depositing their stock with an agent designated by the New Haven for that purpose, this would have required Commission approval, even though the New Haven's charter was not altered and non-assenters were not affected. Indeed, that was precisely the case before this Court in Associated Gas. We see no reason for a different result because here the New Haven, dealing with only a few stockholders who owned large blocks of preferred, was able to change the terms of that stock by simpler means.

Appellees place much reliance on claim that what we have before us is a mere "executory agreement." We find no magic in the word "executory." Most preferred stock provisions, with respect to dividends, sinking funds, voting rights and the like, are to be performed in the future. Whatever the words, the facts are that if the agreements here are valid, the New Haven has become obligated in respect of appellees' shares for a sum nearly as great as the $10,000,000 flood loan which triggered this transaction, and appellees' shares are worth $75 whereas the current market value of shares not having the benefit of the agreements is around $12. Clearly appellees' shares have been changed under the highly practical tests of the marketplace. We think it would indeed be "to place form above substance and to defeat the statutory purpose" if, in the absence of other considerations that ought to lead us to that end, we were to say that an agreement having so great an economic effect did not modify the stock held by appellees. Concededly, the present case is a close one. But, in the absence of administrative construction supporting appellees' contentions, we prefer a construction of § 20a of the Interstate Commerce Act that gives effect to its remedial purposes to give "the commission control over stock and bond issues" in order to avoid for the future abuses in the issuance of securities whereby "railroad properties have been bankrupted or saddled with almost overwhelming burdens of indebtedness, which have not increased the amount or value of property devoted to the public service, have not improved the service rendered, and have on the whole had the effect of increasing the charges for service,"[8] rather than an interpretation, no more reasonable, that would frustrate them. For we must read statutes "not as theorems of Euclid but with some imagination of the purposes which lie behind them." Lehigh Valley Coal Co. v. Yensavage, 2 Cir., 1914, 218 F. 547, 553, certiorari denied, 1915, 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434.

We turn therefore to appellees' contentions that there is an established administrative construction in their favor:

(1) Appellees argue that the Commission's administrative construction of "issue" to include amendments has related only to amendments evidenced by physical stamping of the securities as distinguished from modifications evidenced only by agreement. But the government has cited a number of cases to the contrary,[9] and we think the Commission has properly regarded the question as being whether rather than how the terms of the securities were changed. The report in Fonda, Johnstown & Gloversville R.R. Bonds, 180 I.C.C. 249 (1932), relied on by the District Court, will not carry the weight that appellees put upon it. There

---

8. H.R.Rep. 456, 66th Cong. 1st Sess., at 21; testimony of Commissioner Clark, Hearings on Extension of Tenure of Government Control of Railroads, Senate Committee on Interstate Commerce, 65th Cong. 3d Sess., Vol. I, pp. 235-36.

9. Bonds of Erie R.R., supra; Notes of Union Terminal Co., supra; Notes of Western Maryland Ry., 79 I.C.C. 194, 196 (1923); Securities of Waco B., T., & S. Ry., supra; Extension of Bonds of Port. St. Joe Dock & Terminal Ry., 111 I.C.C. 217 (1920); Peterborough & Hillsborough R.R. Bonds, 117 I.C.C. 301 (1926); Notes of Fredericksburg & Northern Ry., 150 I.C.C. 76 (1928).

the carrier applied for approval of (1) an extension of bonds to be evidenced by stamping or printing a legend of amendment on the bonds, detaching sheets of coupons and attaching new sheets, and (2) an agreement for the deposit of assenting bonds with the mortgage trustee who was to perform these acts. The Commission approved the application for amendment of the bonds but dismissed the application for approval of the agreement as not within Section 20a. Since in that case the bonds themselves were to be altered, the Commission evidently regarded the request for approval of the agreement as surplusage. We do not read the report in Fonda as meaning that if the agreement, rather than the physical altering of the bonds, had been the legally operative act, the Commission would have declined jurisdiction over it; and any such ruling would have run counter both to reason and to the practice embodied in the decisions cited in Footnote 9.

(2) Appellees place heavy reliance on Commission' decisions holding § 20a inapplicable to various types of agreements imposing financial obligations on carriers. Among these are decisions holding the section inapplicable to contracts which evidenced indebtedness but did not take the form of bonds or notes, e. g., equipment purchase contracts, Louisiana Ry. & N. Co., 67 I.C.C. 808 (1921); conditional sale contracts not evidenced by notes or bonds, Lehigh Valley R.R. Conditional Sale Contract, 233 I.C.C. 359 (1939); a contract to finance purchases assigned to a bank, Gulf, Mobile & Ohio R.R. Purchase, 261 I.C.C. 405 (1945); and other forms of indebtedness not evidenced by a note or bond, Grand Trunk Western Ry. Indebtedness, 70 I.C.C. 554 (1921), Davidson Transfer and Storage Co., First Mortgage, 282 I.C.C. 521 (1952). We do not regard these decisions as apposite except to the government's claim, which we have rejected, that the agreements here in question required approval as "evidence of * * * indebtedness." The Commission has also held that authoriza-tion under § 20a(2) is not required when a carrier issues stock purchase warrants, Norfolk Southern R.R., 240 I.C.C. 99 (1940), Western Maryland Ry. Stock, 295 I.C.C. 100 (1955). But we do not view these decisions (which may well rest on the fact that § 20a(2) speaks only of the issuance of "any share of capital stock or any bond," whereas the later acts, cited below, expressly include a "warrant or right to subscribe to or purchase, any of the foregoing") as any abdication of the need for Commission approval of an agreement modifying an existing stock or bond. Appellees are quite right in saying that, in enacting § 20a, Congress did not grant the Commission general power to pass judgment on all obligations incurred by railroads and that, in this early essay in Federal security regulation, Congress did not enact so comprehensive a definition of "security" as it later did in the Securities Act of 1933, 15 U.S.C.A. § 77b(1), the Securities Exchange Act of 1934, 15 U.S.C.A. § 78c(a)(10), and the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79b(a) (16). But neither of these facts weakens the requirement for Commission authorization of agreements to alter those securities over which Congress did give the Commission jurisdiction, admittedly including preferred stock.

(3) Appellees claim that in its annual reports to the Congress the Commission has conceded that § 20a(2) did not cover agreements such as those here before us and has recommended that its jurisdiction be expanded to include them, and that Congress has not seen fit to respond.

In fact, two different recommendations by the Commission are involved. On the view that we take of the case, neither is relevant.

The first recommendation appears in the Annual Reports for 1937, 1938, 1943, and 1944, 51 I.C.C. Ann.Rep. 105 (1937); 52 I.C.C. Ann.Rep. 121 (1938); 57 I.C.C. Ann.Rep. 132–33 (1943); 58 I.C.C. Ann. Rep. 105 (1944). This stemmed from the Commission's investigation of the bankruptcy of the very carrier here be-

fore us, New York, N. H. & H. R.R., 220 I.C.C. 505 (1937). Referring back to its earlier inquiry, New England Investigation, 27 I.C.C. 560 (1913), the Commission advised Congress that for the second time the New Haven had plunged itself into serious financial difficulties by expending its funds for non-railroad property and interests in other railroads in a manner that the Commission was powerless to prevent. It was to enable itself to control such extra-curricular expenditures in the future that the Commission asked "that restrictions be imposed on the expenditure of carrier funds, the incurring of obligations, or the acquiring of property by a carrier or its subsidiaries, except for the operation or legitimate improvement or development of its property." We find nothing in this to indicate a belief by the Commission that it lacked authority under § 20a to prevent a carrier from altering its obligations with respect to its own securities.

The second recommendation, found in the Annual Reports from 1952 through 1955, 66 I.C.C. Ann.Rep. 147 (1952), 67 I.C.C. Ann.Rep. 147 (1953), 68 I.C.C. Ann.Rep. 128 (1954), 69 I.C.C. Ann.Rep. 124 (1955), was that Congress reverse the result reached by the Commission in Lehigh Valley R.R. Conditional Sale Contract, supra, that "evidence of * * * indebtedness" did not include indebtedness under a conditional sale not evidenced by a bond or note, and include in § 20a(2) "any contract for the purchase or lease of equipment not to be fully performed within 1 year from the date of the contract." This is irrelevant for reasons developed above.

(4) Appellees' final and, we think, most serious contention on administrative construction relates to the Commission's conduct in this very case. They assert that the Commission's three years of inaction after full disclosure of the agreements in November 1955, save only for the institution in March 1956 of the inquiry that was closed late that year, brings the case within United States v. Chicago, North Shore & Milwaukee R.R.,

1933, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, where the Supreme Court found the Commission had established an administrative construction of non-applicability of § 20a so definitive as to forbid a change. While we in no way condone the long delay by the Commission in making its challenge to the instant agreements, a delay that may well prove to have been seriously prejudicial to appellees because of the decline in the market value of the New Haven preferred, the facts here are a long way from those which there led the Supreme Court to find a clear "case of uniform administrative construction of section 20a as applied to this company." 288 U.S. at page 13, 53 S.Ct. at page 248.

In North Shore, the United States, at the request of the Commission, sought to enjoin the carrier from issuing securities without Commission authorization. The North Shore answered that it was an "interurban electric railway which is not operated as a part of a general steam railroad system of transportation" and thereby exempted from § 20a(1). The record showed that from the enactment of § 20a in 1920 the Commission had never previously challenged the North Shore's claim to the exemption; that during that period the North Shore had issued $61,662,600 of securities without Commission authorization; that the annual reports filed by the North Shore with the Commission had fully disclosed the character of its operations and the issuance of these securities, and had stated that the latter were issued with the authority of the regulating commissions of Wisconsin and Illinois; that in one instance the North Shore had failed to include this statement and on inquiry from the Commission had supplied it; and that the Director of the Commission's Bureau of Finance had formally advised the North Shore that it came within the narrower exemption for interurban electric railways in the then § 15a of the Interstate Commerce Act. The Court's opinion recites also that, in a series of Annual Reports to Congress, for 1921, 1923, 1924 and 1925,

the Commission had called attention to its lack of jurisdiction under § 20a over the securities of independent interurban electric railways which, like the North Shore, were "engaged in the general transportation of freight in interstate commerce in addition to the transportation of passengers," some of which "correspond substantially to steam roads in all important particulars except that of motive power," although § 15a included "such interurban electric lines as are engaged in the general transportation of freight" even though independent, and had asked that § 20a be amended; that in its 1928 report the Commission made a specific proposal for narrowing the § 20a exemption; and that Congress had consistently refused to act. Moreover, the North Shore did not stand alone. The Commission had equally failed to challenge the exemption of other independent interurban electric railways whose operations were generally similar to the North Shore, and in one instance had formally disclaimed jurisdiction over such a line under the identical language of § 1(22), Proposed Acquisitions by Cincinnati, Hamilton & Dayton Ry. Co., 154 I.C.C. 603 (1929).[10] The Supreme Court thus had ample evidence for concluding that the Commission's dozen years of failure to enforce § 20a against the North Shore and similar carriers represented not oversight or indecision but an administrative determination quite as definite as if embodied in a formal ruling.

Here we have no such adequate evidence. We have only an isolated transaction, an inconclusive discussion, an abortive inquiry, and then two years of silence. It is possible, of course, that silence here meant assent—by someone; but we cannot find a sufficiently clear basis for inferring from what the Commission did and did not do an administrative construction that was never expressed. If 60 years of Commission fail-

ure to consider maintenance-of-way vehicles to be within the Safety Appliance Act, 45 U.S.C.A. § 1 et seq., was not sufficient evidence for the Supreme Court to infer an administrative determination, Baltimore & Ohio R. Co. v. Jackson, 1957, 353 U.S. 325, 330–331, 77 S.Ct. 842, 1 L.Ed.2d 862, we cannot hold three years of inaction eked out by an informal inquiry to be enough.

Appellees were not obliged to rely on so infirm a foundation. They could have required the New Haven to apply under § 20a for approval of the agreement while at the same time moving to dismiss the application for want of jurisdiction, see Lehigh Valley R.R. Conditional Sale Contract, supra, and Davidson Transfer and Storage Company, supra, or they could themselves have sought a declaratory order under § 5(d) of the Administrative Procedure Act, 5 U.S.C.A. § 1004(d). No serious delay need have resulted; for the Commission normally acts on finance applications with relative promptness.

We have dealt with appellees' contention as to the Commission's action and inaction in terms of administrative construction rather than of estoppel, since that is the basis on which appellees have argued. In any event the applicability of the doctrine of estoppel to regulatory agencies is, to say the least, doubtful. See SEC v. Morgan Lewis & Bockius, 3 Cir., 1953, 209 F.2d 44, 49.

Appellees appear at times to suggest that although no single one of the four contentions as to administrative construction which we have just reviewed may be conclusive, the combination is. However, we have found that appellees' first contention is not made out and that the second and third deal with matters which are irrelevant to the only government contention that we sustain. Consequently we are left only with the fourth. This we deem insufficient, for the reasons set forth above.

10. Piedmont & Northern Ry. v. I. C. C., 1932, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115, discussed in the Court's opinion (288 U.S. at pages 10–11, 53 S.Ct. at pages 247–248), constituted no exception

to the uniform administrative construction, since the Piedmont was primarily an interchange carrier engaged in the handling of carload interstate freight.

Appellees assert that in no previous case has the Commission or a court applied Section 20a to a transaction such as that here before us. The government does not dispute this but answers there are also none where the Commission or a court has refused to do so. Under these circumstances the mere fact of novelty does not show where the path of correct decision lies. The problem of interpreting statutes is inevitably one of applying old terms to new situations. Our task is to determine whether, if Congress had envisioned this case, it would have wished to require Commission authorization before a railroad undertook new obligations to stockholders such as those which the New Haven has assumed, and, if so, whether the words that it used were sufficient to express that desire and thereby give fair warning to those who read them. We entertain no doubt in giving an affirmative answer to the former question; and we think that, once "issue" was broadened by nearly four decades of unquestioned administrative construction to include "alter" or "amend," the same answer must be given to the latter. For we must construe § 20a, as the Supreme Court has construed the Securities Act, in the light of " * * * the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of words fairly permits so as to carry out in particular cases the generally expressed legislative policy." SEC v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88.

The District Court ought therefore have granted the government's motion for summary judgment and denied the motions of the banking group, and it should now do so. In order to protect the rights of appellees in the event that rehearing or certiorari should be sought and granted and our judgment reversed, the injunction should contain an exception permitting any or all members of the group, if so advised, to give notice of the exercise of their put during the period between November 18 and December 18, 1959. In view of the short time remaining before November 18, 1959, when the put becomes exercisable, the mandate shall issue on November 10, 1959, unless, if the banking group desires to apply for rehearing, the banking group and the New Haven stipulate that no action under the agreements other than the giving of notice will be taken pending further order of this Court.

Judgment reversed.

### On Petition for a Rehearing in Docket 25793 Dec. 2, 1959.

#### PER CURIAM.

The arguments, advanced in appellees' petition for rehearing, that the obligations undertaken by the New Haven ran to them as bankers rather than as stockholders and that we failed to give due effect to Lehigh Valley RR., Conditional Sale Contract, 233 ICC 359 (1939), raise no questions not fully considered when the case was first before us. However, appellees make two contentions as to which a further word may be warranted.

The first is that assuming that we were right, which appellees, of course, deny, in reversing the grant of appellees' motion to dismiss the complaint or for judgment on the pleadings, we were nevertheless wrong in also holding that the government's motion for summary judgment should be granted. The contention is that appellees are entitled to develop the facts as to the action or inaction by the Commission with respect to the agreement here in question and "as to the economic effect of the transaction in suit at the time it was entered into." However relevant evidence on this latter point may have been before the Commission if permission under 20 (a) had there been sought, it is clearly irrelevant here before us now. And as to both points appellees' proposal comes too late.

The government moved for summary judgment on January 7, 1959. Its motion and appellees' motion for judg-

ment to dismiss or for judgment on the pleadings were argued together before Judge McGohey on February 17. The only additional facts that anyone sought to bring to the attention of the District Court were a "certificate and statement" of the Secretary of the Interstate Commerce Commission dealing with the Commission's inquiry and stating that "A diligent search of the records of the Commission fails to reveal any Commission action, formal or informal, approving the Agreements, or any of them," affidavits of the New Haven's Vice President-Law and his associate as to the November 29, 1955 conference, and the Commission's report of August 6, 1956 referred to in footnote 3 of our opinion. If appellees believed there was any triable issue of fact, that was the time for them to say so. It is no excuse to say, as they now do, that the facts were in the exclusive possession of the government; for Fed.R.Civ.Proc. 56(f), 28 U.S.C.A., gave any needed remedy. No suggestion as to the existence of any triable issue of fact was made, and the District Judge stated in his opinion, D.C., 170 F.Supp. 562, 563:

"All parties agree and I independently find that no genuine issue as to any material fact is raised on any of the motions." No contrary contention was made to us in the briefs or at the argument of the appeal. The proposal for a trial comes too late on petition for rehearing after judgment on appeal, even if we were to assume in appellees' favor that their exploration could develop facts having legal significance—an assumption which we deem highly dubious.

Appellees' second complaint is that our directions to the District Court as to the form of judgment are unclear and erroneous. Their expressed fear that our direction to grant the government's motion for summary judgment might lead the District Court to grant the government's prayer that the agreement be declared invalid as "an unlawful issuance of evidence of indebtedness," which we specifically rejected, is captious. We are confident that, in this and other

respects, the District Court requires no further direction from us to carry out its normal obligation to frame an order not inconsistent with our opinion. In particular appellees raise the question whether we intended the District Court to annul the provision of paragraph 6(d), quoted in our opinion, that if the right of appellees to put the stock to the New Haven should not in the opinion of their counsel be immediately enforceable, or if for any reason the New Haven should fail to purchase the stock, appellees might sell the stock and hold the New Haven liable for the difference between the agreed repurchase price and what was realized. We answer in the affirmative. Any other answer would permit the purposes of Section 20(a) to be frustrated.

The petition for rehearing is denied.

Opinion of Jan. 29, 1960, in Dockets 25793 and 25879

FRIENDLY, Circuit Judge.

This opinion deals primarily with questions of jurisdiction and procedure in Docket No. 25793, to which we shall refer as the government's suit, and in Docket No. 25879, to which we shall refer as the stockholders' suit. The substantive question in both suits is whether transactions between the New Haven and certain bankers, to whom we shall refer as "the banking group" or as "appellees," constituted an issuance of securities by the New Haven requiring approval by the Interstate Commerce Commission under § 20a(2) of the Interstate Commerce Act, 49 U.S.C. § 20a.

On November 2, 1959, we rendered our opinion in the government's suit, holding that the transactions did constitute such an issuance of securities and reversing the judgment of the District Court which had granted the banking group's and denied the government's motions for summary judgment. On December 2, 1959 we denied, in a short opinion, the banking group's petition for rehearing.

On December 17, 1959, counsel for the banking group suggested to us that the government's appeal had been improperly taken to this Court since, as they believed, § 2 of the Expediting Act of 1903, 32 Stat. 823, 49 U.S.C. § 45, required that the appeal from the order of the District Court be taken directly to the Supreme Court. We immediately requested the parties to the government's suit and the stockholders' suit to file briefs on the problems thus raised as to the government's suit and also on certain questions as to the appeal in the stockholders' suit, and instructed the Clerk to defer issuance of the mandate in the former.

Our earlier opinion sets forth the facts and the proceedings in the government's suit. The stockholders' suit was brought in the District Court for the Southern District in 1957 against the New Haven, its then directors, some former directors, Tri-Continental Financial Corporation (a member of the banking group), and others. The complaint was in multiple counts and concerned many transactions. The sixth count set forth the same contracts between the New Haven and the banking group alleged in the government's suit and claimed, as does the government, that the transactions were void for lack of approval by the Interstate Commerce Commission under § 20a(2). The prayer for relief asked among other things that the defendants be enjoined temporarily and permanently from performing the contracts. On February 17, 1959, in the same opinion in which he decided the motions in the government's suit, the District Judge denied a motion for summary judgment by the plaintiffs to grant, and granted a similar motion of Tri-Continental to dismiss, the sixth count of the complaint in the stockholders' suit. On the same day, acting *sua sponte*, the District Judge made a "Memorandum and Order" in the stockholders' suit. 170 F.Supp. 562, 567. In this he stated that, although the grant of summary judgment dismissing the sixth count left the remaining counts undetermined, there was no just reason for delay in entering final judgment dismissing the sixth count, Fed.R.Civ.Proc. rule 54(b), 28 U.S.C.A.; such judgment was entered. On March 17, 1959, the plaintiffs filed a notice appealing to us "from the judgment dated and entered herein February 17, 1959." On October 5, 1959, the day preceding the argument before us in the government's suit, Tri-Continental moved that we dismiss the appeal in the stockholders' suit; this motion has remained undetermined.

### I. The Government's Suit

The government contends its appeal was properly taken to this Court. It says we must look to the Expediting Act as this appears in the Statutes at Large, rather than the version in 49 U.S.C. §§ 44 and 45; that, when we do this, we find that, so far as regards the Interstate Commerce Act, the Expediting Act is limited to suits by the United States to restrain violations of the Interstate Commerce Act as originally enacted in 1887 together with such amendments thereof as had "a like purpose"; and that the amendment to the Interstate Commerce Act, made by § 20a, added by Transportation Act, 1920, ch. 91, § 439, 41 Stat. 494, vesting the Interstate Commerce Commission with jurisdiction over the issuance of railroad securities, was not of "like purpose" with the 1887 Act which was concerned with unreasonable rates, discriminatory practices, and unreasonable preferences. The government argues also that the Expediting Act did not embrace every action brought by the United States to enforce the legislation specified therein but only a "suit in equity"; that the substitution of the words "in every civil action" for "in every suit in equity" in § 2 by the Act of June 25, 1948, ch. 646, § 17, 62 Stat. 989, should not be construed as altering this; that the government's action here was not a suit in equity but an action for a declaratory judgment; and that if the prayer for an injunction in the government's complaint were to be an obstacle to our jurisdiction, the government should now be allowed to abandon this. It says that

even if we should disagree with both these contentions, we are not compelled to set our judgment aside and ought not do so. Finally, the government urges that if none of these contentions should prevail and we should vacate our judgment of reversal, we should also vacate the judgment of the District Court so that the District Judge may enter a fresh judgment from which the government may take an appeal directly to the Supreme Court.

As might be expected, appellees deny that the appeal was properly taken here and contend that we have no alternative to vacating our judgment for lack of jurisdiction. They insist also that if we do this, we lack power to vacate the judgment of the District Court; that this must stand, since the time for taking an appeal to the Supreme Court has

long since expired; and that it would operate as *res judicata* in the stockholders' suit.

(1) One of the few points not disputed is that the construction of § 2 of the Expediting Act must be determined on the text in the Statutes at Large rather than in the Code. Stephan v. United States, 1943, 319 U.S. 423, 426, 63 S.Ct. 1135, 87 L.Ed. 1490; Nashville Milk Co. v. Carnation Co., 1958, 355 U.S. 373, 379–380, 78 S.Ct. 352, 2 L.Ed.2d 340. For understanding of the government's argument it is essential to consider the full text of the Expediting Act of 1903, ch. 544, 32 Stat. 823; this we set forth in the margin.[1] The acts referred to are the Sherman Act of 1890, 15 U.S.C.A. §§ 1–7, 15 note, the Interstate Commerce Act of 1887, 49 U.S.C. § 1 et seq., both without reference to

---

1. "Chap. 544.—An Act To expedite the hearing and determination of suits in equity pending or hereafter brought under the Act of July second, eighteen hundred and ninety, entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' 'An Act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or any other Acts having a like purpose that may be hereafter enacted.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That in any suit in equity pending or hereafter brought in any circuit court of the United States under the Act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, 'An Act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or any other Acts having a like purpose that hereafter may be enacted, wherein the United States is complainant, the Attorney-General may file with the clerk of such court a certificate that, in his opinion, the case is of general public importance, a copy of which shall be immediately furnished by such clerk to each of the circuit judges of the circuit in which the case is pending. Thereupon such case shall be given precedence over others and in every way expedited, and be assigned for hearing at the earliest practicable day, before not less than three

of the circuit judges of said circuit, if there be three or more; and if there be not more than two circuit judges, then before them and such district judge as they may select. In the event the judges sitting in such case shall be divided in opinion, the case shall be certified to the Supreme Court for review in like manner as if taken there by appeal as hereinafter provided.

"Sec. 2. That in every suit in equity pending or hereafter brought in any circuit court of the United States under any of said Acts, wherein the United States is complainant, including cases submitted but not yet decided, an appeal from the final decree of the circuit court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof: *Provided*, That in any case where an appeal may have been taken from the final decree of a circuit court to the Circuit court of appeals before this Act takes effect, the case shall proceed to a final decree therein, and an appeal may be taken from such decree to the Supreme Court in the manner now provided by law."

Approved, February 11, 1903.

Section 17 of the Act of June 25, 1948, ch. 646, 62 Stat. 989, amended Section 2 to read as follows:

"Sec 2. In every civil action brought in any district court of the United States under any of said Acts, wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court."

any amendment, and "any other Acts having like purpose that hereafter may be enacted."

In none of the several amendments to the Expediting Act, the last as recent as 1948,[2] did Congress broaden the reference to the Act of 1887 so as to refer to that Act as amended.[3] Therefore, argues the government, when a suit brought by the United States relates to any provision added to the Interstate Commerce Act of 1887, the suit is within the Expediting Act if, but only if, the added provision was of "like purpose," and regulation of the issuance of railway securities is not of "like purpose" with the Interstate Commerce Act and the Sherman Act as these stood in 1903.

It has been stated that "the general rule unquestionably is that, when a statute refers to and adopts an existing law, its purport is confined to the law as it then exists, and does not embrace or include any subsequent modification of it." Postal Telegraph Cable Co. v. Southern Railway Co., C.C.W.D.N.C.1898, 89 F. 190, 194 appeal dismissed, 4 Cir., 1899, 93 F. 393, affirmed, 1901, 179 U.S. 641, 21 S.Ct. 249, 45 L.Ed. 355. See Kendall v. United States ex rel. Stokes, 1838, 12 Pet. 524, 625; 9 L.Ed. 1181. For many years Congress has used words like "as amended" to make clear an intention to refer not only to an act as originally passed but also to the act as amended. See, e. g., 12 U.S.C.A. § 665, 12 U.S.C.A. § 773; Civil Aeronautics Act of 1938, § 1107, 52 Stat. 973, 1027, Labor-Management Relations Act, 1947, ch. 120, § 207(c) and 208(c), 61 Stat. 155, 29 U.S. C.A. §§ 177(c), 178(c). Moreover, and more significant, precedents show full awareness by Congress of language suitable to make an intention to include not only existing but future amendments entirely plain. See, e. g., 12 U.S.C.A. §

1040, 12 U.S.C.A. § 1150a, 12 U.S.C.A. § 1431(i), 15 U.S.C.A. § 77ccc(17), (18), Labor-Management Relations Act, 1947, ch. 120, § 212, 61 Stat. 156, 29 U.S.C.A. § 185.

When we turn from these general considerations to the specifics concerning application of the Expediting Act to the Interstate Commerce Act, perplexities abound. The first consideration in point of time favors appellees. In 1903, the Interstate Commerce Act of 1887 had itself been thrice amended, by the Act of March 2, 1889, ch. 382, 25 Stat. 855, the Act of February 10, 1891, ch. 128, 26 Stat. 743, and the Act of February 8, 1895, ch. 61, 28 Stat. 643; it is difficult to believe that Congress' failure to insert the words "as amended" in the Expediting Act manifested an intention that, in each case brought by the United States to enforce one of the sections of the 1887 Act thus amended, the Court would have to determine whether or not the amendment was of "like purpose" with the original Act. We come then to history that weighs for the government. Eight days after approval of the Expediting Act, the Elkins Act of February 19, 1903, ch. 708, 32 Stat. 847, 49 U.S.C. §§ 41–43, was approved. It included, in § 3, a specific provision making the Expediting Act applicable to suits brought for its enforcement. That fact alone is inconclusive, for the Elkins Act was not an amendment of the Interstate Commerce Act and, though it would seem rather clearly to have been of "like purpose," Congress might have wished to place the question beyond all doubt. However, § 1 of the Elkins Act contains the phrase "under the provisions of the Act to regulate commerce or Acts amendatory thereto," thereby demonstrating that this method of cross-reference was well-known to Congress at the time when

---

2. These include the Act of February 19, 1903, 32 Stat. 847; the Act of June 25, 1910, ch. 428, 36 Stat. 854; the Act of June 19, 1934, ch. 652, § 401(d), 48 Stat. 1092; the Act of April 6, 1942, ch. 210, 56 Stat. 198–199; the Act of June 9, 1944, ch. 239, 58 Stat. 272;

and the Act of June 25, 1948, ch. 646, 62 Stat. 989.

3. As shown below, the Hepburn Act of June 29, 1906, 34 Stat. 592, had the effect of broadening the scope of the Expediting Act, for a brief period, to include Acts amending the Act of 1887.

and in the context with which we are here concerned.

The government could find further support in another statute of the same month. The Act of February 25, 1903, ch. 755, 32 Stat. 903, contains an appropriation "for the enforcement of the provisions of the Act entitled 'An Act to Regulate Commerce', approved February fourth, eighteen hundred and eighty-seven, and all Acts amendatory thereof or supplemental thereto, and of the Act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, and all Acts amendatory thereof or supplemental thereto." Since the Sherman Act had not then been amended, the reference to "Acts amendatory thereof" must be to future amendments; the same words with respect to the Act of 1887 must have the same meaning; and the contrast with the Expediting Act, approved only three weeks before, is striking. Nor can this contrast be dismissed on the ground that the Act of February 25, 1903 was an appropriations act where the precise text may not have been thoroughly considered. For the very section here discussed also contained the provision granting immunity from prosecution for any matter concerning which a person might testify or produce evidence "in any proceeding, suit, or prosecution under said Acts."

Still more support to the government's contention is furnished by § 5 of the Hepburn Act of 1906, ch. 3591, 34 Stat. 584, 592. This made the Expediting Act applicable to any suit to enjoin any order or requirement of the Commission and also "to any proceeding in equity to enforce any order or requirement of the Commission, or any of the provisions of the Act to regulate commerce approved February fourth, eighteen hundred and eighty-seven, and all Acts amendatory thereof or supplemental thereto." The Act of June 18, 1910, ch. 309, 36 Stat. 539, 554, creating the Commerce Court, removed the quoted clause, and, when the Urgent Deficiencies Act of 1913, ch. 32, 38 Stat. 208, 219, abolished the Commerce Court and provided that suits to enjoin orders of the Commission should be heard by three-judge courts, the Hepburn expansion of the scope of the Expediting Act was not restored. Nevertheless the Hepburn history gives added significance to the failure of Congress, when amending the Interstate Commerce Act by Transportation Act, 1920, ch. 91, 41 Stat. 456, 474, to expand the Expediting Act to include suits in equity to enforce acts amendatory to the Interstate Commerce Act.

The government may draw further support from certain anomalies that seem to result from construing the Expediting Act to apply to all the provisions added by the Transportation Act. We shall mention one. Section 1(20) added to the Interstate Commerce Act in 1920 provides that railroad construction, operation or abandonment contrary to the provisions of that paragraph or of paragraphs (18) or (19) of § 1 "may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the state or states affected, or any party in interest. * * " If the Expediting Act applies to any suit by the government to enjoin violation of the Interstate Commerce Act as amended, there is a direct appeal to the Supreme Court if such a suit is brought by the United States, though appeal is to the Court of Appeals if the suit is brought by the Commission, as it was in Piedmont & Northern Ry. v. Interstate Commerce Commission, 1932, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115.

When we move beyond 1920, we find considerations favoring appellees. In United States v. Chicago, North Shore & Milwaukee R. Co., 1933, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, the Supreme Court took jurisdiction of a direct appeal by the government from the refusal of a District Court to enjoin the issuance of securities, not authorized by the Commission, by an electric railroad which the government claimed not to be within the exception of § 20a(1). Appellees

overstate their case when they say the government is asking us to "overrule" that decision, since there the question of jurisdiction was not raised.[4] But the case nonetheless has its importance, especially since it was decided by a bench including two judges so sensitive. to a question of jurisdiction as Justices Van Devanter and Brandeis. Another consideration favorable to appellees is furnished by § 401(d) of the Communications Act of June 19, 1934, 48 Stat. 1064, 1092, 47 U.S.C. § 151 et seq. The Transportation Act, 1920, had amended § 1(1) of the Interstate Commerce Act to include within the scope of the Act common carriers engaged in the transmission of intelligence only by wire or wireless, although not all provisions of the Act were made applicable to them. By Title II of the Communications Act of 1934, Congress vested the regulation of such carriers in the Federal Communications Commission. This included not only the furnishing of service, the prevention of discrimination and preferences, and the reasonableness of rates, but also such matters as the construction or extension of lines, § 214, and the keeping of uniform accounts, § 220, no counterpart of which were in the original Interstate Commerce Act. Yet § 401(d) of the Communications Act provided that the Expediting Act "shall be held to apply to any suit in equity arising under Title II of this Act wherein the United States is complainant," and we assume that "any" meant any. The construction urged by the government would thus give the Expediting Act a narrower role with respect to the rail carriers as to which it was originally enacted, than to communications carriers as to which it did not apply at all until 1920.

▮ With the language inconclusive and the history thus Janus-faced,

we resort to considerations of practicality. The basic purpose of § 2 of the Expediting Act was " * * * to ensure expeditious disposition of suits in equity brought by the United States" and to eliminate the opportunities for delay which were then inherent in appeals to the Supreme Court by way of the Circuit Court of Appeals, United States v. California Cooperative Canneries, 1929, 279 U.S. 553, 558, 49 S.Ct. 423, 425, 73 L.Ed. 838. In order to be truly swift, a remedy must also be sure. We cannot believe that Congress meant to confront litigants and the courts with the necessity of determining, in each case of an appeal in a suit in equity to restrain violation of the Interstate Commerce Act, as this has been amended, whether the provision sought to be enforced was or was not of "like purpose" with the Sherman Act or the Act of 1887. Even with respect to § 20a that decision might not be quite so easy as the government claims, since, as indicated in our first opinion, p. 26 [276 F.2d 532], the purpose of railroad security regulation by the Commission was closely related to service and charges. The difficulties would be compounded under Part II of the Interstate Commerce Act dealing with motor carriers, Part III dealing with certain water carriers, and Part IV dealing with freight forwarders, since although certain regulation of these carriers is probably of "like purpose," no provision of these parts comes from the 1887 Act. And the problem would be aggravated by the repeal, by § 13 of the Act of February 13, 1925, 43 Stat. 936, 941–42, of the Act of September 14, 1922, 42 Stat. 837, which had provided that if an appeal in a civil case had been taken to the Court of Appeals when it should have been taken to the Supreme Court or *vice versa*, the appeal should be transferred to the proper court. Although

---

4. Mr. Justice Reed cites the North Shore case as one authority on jurisdiction in Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, 454, footnote 3, 61 S.Ct. 1064, 85 L.Ed. 1453. However, Union Pacific, a suit to enforce the Elkins Act, was clearly within the Expediting Act, the jurisdiction on direct appeal does not seem to have been contested, and nothing in the footnote reference affords a basis for inferring that the Court had given any further consideration to the jurisdictional question that might have been but was not raised in North Shore.

the question is by no means free from doubt, we therefore conclude that the Expediting Act applies generally to the Interstate Commerce Act as amended and not simply to provisions that have descended from the 1887 Act or have "like purpose." On this construction, meaning is given to the reference to "any other Acts having a like purpose" by interpreting that phrase to cover acts having a purpose similar to the Sherman Act or the original Interstate Commerce Act although not amendatory thereof. See, e. g., United States v. E. I. Du Pont De Nemours & Co., 1957, 353 U.S. 586, 588, 77 S.Ct. 872, 874, 1 L.Ed.2d 1057, in which the Supreme Court entertained a direct appeal under § 2 of the Expediting Act from a judgment "dismissing the Government's action brought in 1949 under § 15 of the Clayton Act."

■ (2) The government next says that even though this be so, the Expediting Act would not have applied here prior to its 1948 amendment since the government's action was not a "suit in equity" but an action for a declaratory judgment, which has been said to be neither an action at law nor a suit in equity but *sui generis,* see, e. g., United States Fidelity & Guaranty Co. v. Koch, 3 Cir., 1939, 102 F.2d 288 and that the 1948 amendment, made along with the general revision of the Judicial Code, which substituted "in every civil action" for "in every suit in equity," could not have been intended to effect a substantive change. On the latter point the government relies on the absence of any indication in the revisers' notes that a change was intended, Fourco Glass Co. v. Transmirra Products Corp., 1957, 353 U.S. 222, 227–228, 77 S.Ct. 787, 1 L.Ed. 2d 786, and on the fact that a literal construction would result in making suits for money penalties, see, e. g., 49 U.S.C. § 1(12), (17) (a), (21), § 6(10), and § 16(8) and (9), and reparations actions by the government directly appealable to the Supreme Court, the latter in conflict with the views expressed in United States v. Interstate Commerce Commission, 1949, 337 U.S. 426, 442–443, 69 S.

Ct. 1410, 93 L.Ed. 1451. We note also that although the United States Code, 49 U.S.C. § 44, substitutes the words "in any civil action" for "in any suit in equity" in § 1 of the Expediting Act, the reference, § 32 of the Act of June 25, 1948, ch. 646, 62 Stat. 991, 28 U.S.C.A. § 451 note, does not support this; and the cross-reference to the Expediting Act in the Federal Communications Act, 47 U.S.C. § 401(d), escaped the change from "suit in equity" to "civil action" made in § 2 of the former. We therefore agree that to construe the words "in every civil action" substituted in § 2 of the Expediting Act as including actions for the payment of money would indeed be absurd literalism.

■ However, it does not follow that no effect whatever should be given to the amendment. Although an action by the government for a declaratory judgment that a transaction violates the Interstate Commerce Act might not have been a "suit in equity," we think that such an action, especially when addressed to a transaction still executory, is sufficiently akin to such a suit to come within § 2 of the Expediting Act as amended by the Act of 1948; and we leave to others the problem whether such an action would be within § 1 or 47 U.S. C. § 401(d). This conclusion follows *a fortiori* where, as here, the complaint included a prayer for an injunction. The distinction between such a complaint and the type of complaint exemplified by Northern Pacific Ry. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, is too thin to warrant a difference in result.

We hold therefore that although both the government's arguments for the propriety of having taken its appeal to this Court rather than to the Supreme Court are substantial, we would not have decided the appeal if our appellate jurisdiction had been questioned before we rendered our judgment.

■ (3) Appellees say this ends the matter, since the question of appellate jurisdiction may be raised at any time. In support of this, they cite cases that

have permitted the question to be raised on petition for rehearing. Black & Yates v. Mahogany Association, 3 Cir., 1941, 129 F.2d 227, 236–237, 148 A.L.R. 841, certiorari denied, 1942, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539; Cummings v. Redeeriaktieb Transatlantic, 3 Cir., 1957, 242 F.2d 275, 276. Here, however, the question was not raised until after a petition for rehearing had been denied and our judgment had become final. While it was entirely proper for appellees to suggest the question, as indeed it would have been for us to take note of it on our own motion, our holding that the government's appeal should have been taken directly to the Supreme Court does not lead automatically to a conclusion that our judgment is void.

If we had decided in favor of appealability on a motion to dismiss and had rendered judgment on the merits, although our judgment would have been subject to review and possible reversal on a timely application to the Supreme Court, we doubt that it would have been open to collateral attack or that we would have been compelled to reopen it after the time for applying for rehearing had expired. Here, although appellate jurisdiction was not argued, the question was necessarily before us and, as recently said by Judge Pope in Yanow v. Weyerhaeuser Steamship Company, 9 Cir., 1959, 274 F.2d 274, certiorari denied, 1960, 80 S.Ct. 671, "the reversal of the judgment below was a tacit determination of the court's jurisdiction and a final adjudication of that issue." If there were no other way to preserve the right of the United States to Supreme Court review of the District Court's judgment, the time for appeal from which to the Supreme Court has expired, we might well be required to leave our judgment of reversal in effect, as the Ninth Circuit left its judgment in Yanow, with appellees having the right to apply for review on all questions, including our action in doing so. However, we need not decide that question, since we can preserve the right to direct review of the District Court's judgment

granted the government by the Expediting Act without maintaining a judgment that we would not have rendered if our appellate jurisdiction had been seasonably questioned.

In a long line of decisions going back as far as Gully v. Interstate Natural Gas Co., 1934, 292 U.S. 16, 54 S.Ct. 565, 78 L.Ed. 1088, where appeals were taken to the Supreme Court under § 266 of the Judicial Code, now 28 U.S.C. § 1253, from judgments of three-judge courts under circumstances held inappropriate for that procedure, although not obviously so, the Court has stated that it would "enforce the limitations of § 266 by an order framed to save appellants their proper remedies," Phillips v. United States, 1941, 312 U.S. 246, 254, 61 S.Ct. 480, 484, 85 L.Ed. 800. This was by vacating the decree under appeal and remanding "the cause to the court which heard the case so that it may enter a fresh decree from which the appellants may, if they wish, perfect a timely appeal to the circuit court of appeals." Appellees' attempt to distinguish these cases on the basis that they involved "a jurisdictional defect in the Court below, rather than, as here, in the Appellate Court" ignores the clear holding of the Supreme Court that in such cases "the issue is not one of jurisdiction of the district court as a federal court" and the defect was that the Supreme Court was "without jurisdiction to hear the merits of the appeal." Wilentz v. Sovereign Camp, 1939, 306 U.S. 573, 582, 59 S.Ct. 709, 714, 83 L.Ed. 994. In Healy v. Ratta, after the Supreme Court had dismissed a direct appeal from a decree rendered by three judges, 1933, 289 U.S. 701, 53 S.Ct. 522, 77 L.Ed. 1459, the Court of Appeals decided an appeal seasonably taken to it, 1 Cir., 1933, 67 F.2d 554, and its judgment was subsequently reviewed by the Supreme Court on the merits, 1934, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248. The propriety of the procedural course there taken was confirmed in Phillips v. United States, supra, 312 U.S. at page 254, 61 S.Ct. at page 484. If there be need of further

proof of the existence of the power thus to vacate the judgment below where the sole defect is lack of appellate jurisdiction, the statement in Columbia Gas & Electric Co. v. American Fuel Co., 1944, 322 U.S. 379, 384, 64 S.Ct. 1068, 88 L.Ed. 1137, would meet it. We know the Supreme Court has many powers that we do not; but we can see no basis for thinking that if the Supreme Court, with its limited direct appellate jurisdiction over the district courts, can vacate a district court judgment when an appeal was not properly before it, a court of appeals, which regularly reviews judgments of the district courts, cannot. Cf. In re Cook's Motors, 1 Cir., 1947, 142 F.2d 369. To be sure, the court will do this only when the jurisdictional problem "had not been fully settled," Rorick v. Board of Commissioners, 1939, 307 U.S. 208, 213, 59 S.Ct. 808, 811, 83 L.Ed. 1242; Oklahoma Gas & Elec. Co. v. Oklahoma Packing Co., 1934, 292 U.S. 386, 392, 54 S.Ct. 732, 78 L.Ed. 1318. But we think this opinion settles that the jurisdictional problem here "had not been fully settled"—even though it may settle nothing else.

## II.  The Stockholders' Suit

██ ██ We pass now to the appealability of the judgment dismissing the sixth count of the complaint in the stockholders' suit. As to this, of course, § 2 of the Expediting Act has no application, since that Act is limited to suits by the United States. The questions are whether the judgment is appealable under 28 U.S.C. § 1291 as a final judgment by virtue of the certification under Fed. R.Civ.Proc. 54(b), or under 28 U.S.C. § 1292(a) (1) as an interlocutory order refusing an injunction. The judgment plainly was not final even as to the transactions here challenged, since other theories of liability remained. Schwartz v. Eaton, 2 Cir., 1959, 264 F.2d 195. However, we hold it was appealable as an interlocutory order refusing an injunction under § 1292(a) (1).

The sixth count alleged the invalidity of the transactions here in issue for lack of Interstate Commerce Commission au-

thorization. The prayer sought, *inter alia*, a judgment "enjoining temporarily and permanently the performance and enforcement of said contracts by the defendants." Judge McGohey's order of February 17, 1959, denied plaintiffs' motion for summary judgment on the sixth count and granted Tri-Continental's motion to dismiss that count, 170 F.Supp. 562. His "Memorandum and Order" of the same day directed the entry of judgment dismissing the sixth count and such judgment was entered. Despite the District Court's characterization of the judgment as final, it was in fact "interlocutory" not only as regards the entire litigation but even as to the particular transaction here at issue. An order, misnamed a "judgment," dismissing a complaint for an injunction would seem to be the refusal of an injunction in the ordinary meaning of words; § 1292(a) (1) applies to the refusal of final as well as temporary injunctions provided only that the order is "interlocutory," Federal Glass Co. v. Loshin, 2 Cir., 1954, 217 F.2d 936, 937; and nothing turns on the fact that the notice of appeal spoke only of "the judgment dated and entered herein February 17, 1959" and did not refer also to the order denying plaintiffs' motion. 7 Moore, Federal Practice, ¶ 73.14, at 3166.

Appellees argue that the judgment was not appealable as an interlocutory order refusing an injunction under § 1292(a) (1) because, even as to the transactions here challenged, other grounds for the grant of an injunction remained undetermined. Decisions of this Court point against this. In Raylite Electric Corporation v. Noma Electric Corporation, 2 Cir., 1948, 170 F.2d 914, and Federal Glass Company v. Loshin, supra, we held that, in a suit for an injunction, an order denying a motion of plaintiff for summary judgment was appealable under § 1292(a) (1) although the plaintiff might later prevail upon a trial. The Loshin decision is all the more meaningful because of the thorough consideration on the part of Judges Learned Hand and Frank required by Judge Clark's

strong dissent favoring the contrary view taken by the Third Circuit, Morgenstern Chemical Co. v. Schering Corp., 1950, 181 F.2d 160, 162. Despite what was said in the second decision in Loshin, 2 Cir., 1955, 224 F.2d 100, 101, Raylite and first Loshin must be taken as the law of this Circuit; and incongruity, if any there be, in the fact that reversal of the District Court's order, on an appeal upheld as from an "interlocutory" order under § 1291(a) (1), would result in the grant of final relief, existed in Raylite and Loshin as fully as here. In fact the instant case, where a separate count, asserting a distinct legal theory, was dismissed solely on a matter of law, seems an *a fortiori* one, and Telechron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757, supports appealability under § 1292(a) (1). There, in an action for a declaratory judgment, plaintiffs sought an injunction in part on grounds relating to the patent laws and in part on grounds of unfair competition; the court held that an order striking the portions of the complaint relating to unfair competition was appealable under what is now § 1292(a) (1), although plaintiff's claims for relief on grounds under the patent laws remained open.

Our decisions in Studer v. Moore, 2 Cir., 1946, 153 F.2d 902, Porter v. American Distilling Co., 2 Cir., 1946, 157 F.2d 1012, Schwartz v. Eaton, supra, John & Sal's Automotive Service v. Jones Beach State Parkway Authority, 2 Cir., 1959, 267 F.2d 862; and Goldlawr v. Heiman, 2 Cir., 1959, 273 F.2d 729, cited in opposition to appealability, do not demand a different conclusion. In all those cases appellants sought to sustain appealability as from a final judgment under § 1291; neither the briefs nor the opinions discussed appealability as from the refusal of an injunction under § 1292(a) (1); and the problem in all save Schwartz v. Eaton, was the dismissal of some but not all of the defendants, which we have recently discussed in Goldlawr v. Heiman, supra.

We are fully aware that "Finality as a condition of review is an historic characteristic of federal appellate procedure," Cobbledick v. United States, 1940, 309 U.S. 323, 324, 60 S.Ct. 540, 541, 84 L.Ed. 783 and of the important considerations of policy behind this. But 28 U.S.C. § 1292 constitutes a departure from that policy and we would not be warranted in importing into its construction considerations drawn from the very policy to which it is an exception. We doubt that upholding appealability in the unusual circumstances here presented will often lead to repeated appeals from refusals of injunctions as to a single claim of wrong. Cases like this, in which a plaintiff has presented to the lower court only one of several legal grounds for an injunction, will, we think, be exceedingly rare. For parties are more interested in victory in the court below than in the number of appearances they can make in the court above. We hold therefore that the appeal in the stockholders' suit is properly before us.

That appeal presents the identical issue involved in the government's suit. The two cases were heard together in the District Court. In the appeal in the government's suit we permitted the stockholders to submit an *amicus* brief and appellees to answer this in a reply brief. Here, as in Trans World Airlines, Inc. v. Civil Aeronautics Board, 2 Cir., 1950, 184 F.2d 66, 71–72, certiorari denied Sparks v. Civil Aeronautics Bd., 1951, 340 U.S. 941, 71 S.Ct. 504, 95 L.Ed. 679, nothing will be gained by a further argument and "an immediate decision on this issue may accelerate the parties' access to the Supreme Court, if they are disposed to seek it." For the reasons fully set forth in our opinions in the government's suit, we reverse the judgment of the District Court in the stockholders' suit.

We therefore direct:

I. In the government's suit:

(1) That our judgment dated November 2, 1959 be vacated;

(2) That the judgment of the District Court dated July 10, 1959 be vacated for the sole purpose of enabling the District

Judge to enter a fresh judgment from which the United States may, if so advised, take a direct appeal to the Supreme Court under 49 U.S.C. § 45;

(3) That no costs be allowed on the appeal; and

(4) That the mandate issue five days after the filing of this opinion.

II. In the stockholders' suit:

(1) That the motion to dismiss the appeal be denied;

(2) That the judgment dimissing the sixth count of the complaint in the stockholders' suit be reversed, with costs, and that an injunction, containing the exception stated in our opinion of November 2, 1959, p. 34 [276 F.2d 536], shall issue; and

(3) That issuance of the mandate be stayed for 30 days pending the filing of a petition for certiorari and, if such a petition be filed within said period, until final determination thereon, such stay to be conditioned upon the filing within 10 days of a stipulation by Tri-Continental and the New Haven as set forth in said opinion, p. 34 [276 F.2d 536].

It is so ordered.

WATERMAN, Circuit Judge (concurring in part and dissenting in part).

I concur with my brother panel members in the dismissal of No. 25793, the government suit, for lack of appellate jurisdiction and I concur in vacating the district court's judgment. I also concur with them in holding that the judgment order of Judge McGohey below in No. 25879, the stockholders' derivative action, was not a final judgment order, and therefore not appealable as such. I disagree with them, however, insofar as they hold that the order below dismissing the Sixth Count in No. 25879 is appealable under 28 U.S.C. § 1292(a) (1) as an interlocutory order refusing an injunction; but I wish it to be clear, nevertheless, that if I believed the issue were properly before us for determination I would agree with them and join with them in their disposition of the case.

The stockholders' complaint contains various allegations of wrongdoing, i. e., contains multiple claims against various defendants. Not all the counts are joined in by the same plaintiffs or seek relief from the same defendants. In Counts 5, 6 and 7, however, there is complete identity of plaintiffs and defendants. The prayers for relief in the complaint include prayers for enjoining both temporarily [1] and permanently the performance and enforcement of certain contracts of the New Haven, one of which is the contract involved in No. 25793, the government action. Counts 5, 6 and 7 allege that this contract is a nullity and seek to enjoin its performance. No other contract is involved in these counts. The government action alleged this contract to be null and void because the New Haven had not obtained prior approval to enter into it from the Interstate Commerce Commission. Count 6 of the stockholders' suit alleges that the contract is void for the same reason.

The government suit in its entirety having come before the trial judge for disposition, Count 6 of the stockholders' suit was simultaneously disposed of also. No disposition was made of any of the other allegations in the stockholders' suit, not even of Counts 5 and 7, despite the fact that these Counts related to the

---

[1]. The question of whether a "temporary" injunction should issue was not before Judge McGohey at the time of the ruling sought to be appealed from. The stockholder plaintiffs moved for partial summary judgment on their sixth count, and if they had prevailed would have been entitled to a permanent injunction preventing performance of this one of the several contracts they were attacking. A cross-motion for summary judgment to dismiss the sixth count was filed by one of the 25 defendants. The cross-motion was granted as to that defendant. The stockholders' motion was denied. In this wise the sixth count was dismissed, and my colleagues hold this dismissal to be the refusal of an injunction. It does not appear how many of the defendants had been served at this time, but at least nine of the twenty-five were.

same contract attacked in Count 6, involved the identical parties plaintiff and identical parties defendant; and prayed for identical relief. Count 5 seeks to nullify the contract and enjoin its performance on the ground that its making was, and its performance would be, violative of Section 17(a) of the Investment Company Act of 1940, 15 U.S.C.A. § 80a 17(a). Count 7 seeks nullification and an injunction on the ground that the contract was made in violation of the charter provisions of the New Haven. Though I believe it well within his discretion for the trial judge to combine his consideration of the legal theory of recovery contained in Count 6 of the stockholders' suit with his adjudication of the validity of that theory in the Government's suit, I am of the opinion that the legal theories advanced by the stockholders in support of Counts 5 and 7 must also be resolved below before the question of whether this injunction was properly refused can become appealable.

It is my thought that we should not entertain an appeal under 1292(a) (1) until all the legal theories advanced to support or deny injunctive relief in connection with one claim of breach, or one claim of wrong, have been considered and adjudicated upon below. Otherwise we lay ourselves open to interlocutory appeals, piecemeal, first to review with respect to a single claim one theory of recovery or defense, and then another, and then yet another, so long as prayers for injunctions are contained in the pleadings and the pleadings are ruled upon below at separate times. This would result in poor judicial administration, would be contrary to the long-standing practice and policy of the federal courts, and could not have been contemplated as within the purview of 1292(a) (1). For instance, here, because petitioners set forth three separate and distinct legal theories to support the issuance of an injunction to prevent performance of a contract we could be faced with three separate appeals from the grant or denial of that prayer; yet the single claim before the court is whether, as a matter of law, that contract is a nullity.

Although the majority reverses the action of the court below with respect to the one count, the sixth, and orders that a permanent injunction issue, we are unanimous in holding that the order below with reference to this one count (which order is interpreted by the majority as an order refusing an injunction) was not a final order so as to be appealable as such. We state the order was not final and was not appealable because all theories of defendants' liability were not disposed of below by the ruling.

The majority, however, grants prayers of final relief as a matter of law, though we all say we are not reversing a final order below denying relief. This final relief is granted by the taking of appellate jurisdiction over an order that we are unanimous in denominating an interlocutory, non-final order, and even though the court below did not adjudicate upon all theories of defendants' liability.

It is claimed that we may properly do this, despite the clear inconsistency of doing so, not only by literally interpreting the statute, 1292(a) (1), but also on the authority of our decisions in three cases cited in the majority opinion. I only point out that in the instant case we have at least three theories of liability with reference to one contract and that contract is one of several contracts attacked in the suit, whereas a reading of the three cases relied upon will demonstrate that the portions of those cases permitted to be appealed dealt with quite different and broader problems of liability. In Telechron, which the majority particularly relies upon, the counts involved application of federal law on the one hand and state law on the other. The case of Schwartz v. Eaton, which the majority seeks to distinguish as not applicable here, was a case like this one, brought by stockholders, and a close reading of the opinion in that case appears to me to lend substantial support to the position I take.

By taking jurisdiction of this appeal under 28 U.S.C. § 1292(a)(1) the majority creates opportunities for harassment and delay in suits such as this. Cf. Baltimore Contractors v. Bodinger, 348 U.S. 176 at page 179 ff., 75 S.Ct. 249, at page 251, 99 L.Ed. 233; Schwartz v. Eaton, 2 Cir., 1959, 264 F.2d 195; Armstrong-Norwalk Rubber Corp. v. Local No. 283, 2 Cir., 1959, 269 F.2d 618, 621; Morgenstern Chemical Co. v. Shering Corp., 3 Cir., 1950, 181 F.2d 160, 162.

I would grant the motion to dismiss the stockholders' appeal.

On Application for Hearing *in banc* in Glenmore et al. v. Ahern et al., Docket 25879.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, and FRIENDLY, Circuit Judges.

Application denied.

CLARK, Circuit Judge (dissenting).

In this case a panel majority has held, against strong dissent by Judge WATERMAN, that a trial judge's rejection of one theory of liability, leaving others pending, is the denial of an injunction sufficient to support an appeal and reversal for issuance of the injunction. Glenmore v. Ahern, 2 Cir., 276 F.2d 537. Since this raises questions of the most serious nature, I asked all my brothers, as soon as I learned of the ruling, to consider it further *in banc*. While the vote was divided, it was against such consideration here. The matter is of such importance in our daily practice that it seems desirable now for me to point out the uncertainty of the ruling both for the present case and for the future. I am not enamored of *in banc* proceedings; in the particular cases where we have tried them, they appear to have raised more questions than they have settled. But so long as we do order them at least occasionally, it would appear that a decision such as this on a continually recurring issue of practice, against so many strong precedents and reasons of policy, is one made to order for such procedure if any case is.

Naturally I am sorry that I could not express these convictions before or at least with the filing of the decision, as would have been possible had our custom of intramural warnings of the approach of overruling opinions been observed here. As it was, I acted at the earliest possible moment. My dissent appears to have had one unique consequence in that it has induced a counterdissent to it wherein my authority to take these steps seems to be questioned. I do no see how this can be pressed, since the statute authorizing *in banc* procedure, 28 U.S.C. § 46(c), contains no such restriction and the leading case, Western Pac. R. Corp. v. Western Pac. R. Co., 345 U.S. 247, 250–277, 73 S.Ct. 656, 97 L.Ed. 986, continually stresses *judicial* as opposed to *party* initiative and quotes legislative history to support that conclusion. Further, I do believe the court gains standing by encouraging free and thorough canvassing of these issues without the deadening influence of constraining restrictions.

The decision was rendered in a stockholders' derivative action, which challenged as invalid without I. C. C. approval transactions between the New Haven Railroad and certain bankers to raise money on loan through the means of somewhat involved transfers of a large block of preferred stock. The district court had held the transactions valid, but in the companion appeal of United States v. New York, New Haven & Hartford R. Co. my brothers first ruled—at the behest of the United States on behalf of the Interstate Commerce Commission— that they were invalid. 2 Cir., 276 F.2d 525. Later, however, they ruled that they lacked authority to pass on that issue, since appeal must go directly to the Supreme Court; and then in the same opinion a majority reversed the dismissal of Count 6 of the stockholders' complaint to issue an injunction substantially similar to the one they were holding beyond their authority in the action by the United States. This is the decision of January 29, 1960, cited above. Count 6, under the pleader's course of pleading dif-

ferent legal theories in separate counts,[1] alleged the invalidity of the transactions in issue for lack of I. C. C. authorization.[2] The judge dismissed this count in what he termed a final order; but my brothers aptly, say: "The judgment plainly was not final even as to the transactions here challenged, since other theories of liability remained," and again " * * * even as to the transactions here challenged, other grounds for the grant of an injunction remained undetermined." Nevertheless they hold it "appealable as an interlocutory order refusing an injunction under § 1292(a) (1)" of 28 U.S.C.

Under the settled federal rule that "claim" refers to the operative facts giving rise to an enforceable right, and not to legal theories, Original Ballet Russe v. Ballet Theatre, 2 Cir., 133 F.2d 187, it is clear that here the claim refers to the money-raising transactions, the invalidity of which is asserted in this litigation. Hence the claim has not yet been fully passed upon; the judge has merely said in an interlocutory ruling that he will not accept one ground of asserted invalidity. See the opinion below, D.C.S.D. N.Y., 170 F.Supp. 562, 567. This may be useful in illustrating his approach to the parties and warning them of what they must do to persuade. Beyond this it is indeed difficult to see what it can mean by way of definitive action. For it is the judge's decision on the transactions themselves which is important; his rationale is not decisive. When the time for final action comes he may use an-

other rationale or vary his present one or disclose none at all; whatever he has said he will be in error only if his decision is incorrect. A right decision for the wrong reason is always acceptable. This is so elemental that its partial challenge here is strange. Just what has been determined either by the ruling below or the reversal here? The answer is nothing. After a full hearing below the judge may revert to his original analysis or adopt any other which he thinks may lend persuasive force to his adjudication. So the judge has not yet denied an injunction, and it is improper for us to act as though he had. Of course the parties could have asked the judge for immediate more definitive action by simply bringing on the issue of the award of an injunction *pendente lite*, instead of the present proceedings seeking only a partial summary judgment. But the difference between a mere "step" in controlling the litigation before the trial court and definitive adjudication is a naturally recurring one, often explained and defined, as in Baltimore Contractors v. Bodinger, 348 U.S. 176, 184, 75 S.Ct. 249, 99 L.Ed. 233; City of Morgantown, W. Va. v. Royal Ins. Co., 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347. The concededly interlocutory nature of the ruling here seems in fact more obvious than in the cases just cited.[3]

The basis for the holding here according some more definitive character to the judge's present action is based upon the first opinion in Federal Glass Co. v. Losh-

1. Now undesirable (as the event here again tends to show), but not actually forbidden. See Clark, Code Pleading 459–461, 462–464 (2d Ed. 1947); F.R.Civ.P. 10 (b); Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974, 976.

2. Of the ten counts left standing, numbers 5 and 7 are particularly interesting, since they are so precisely similar to 6, except that 5 relies on the Investment Companies Act, and 7 on the railroad charter, to show invalidity of the questioned transactions.

3. It is necessary to stress the judge's undoubted power to make a definitive ruling when he so chooses because question is suggested as to whether he must state all

the grounds for decision or can raise doubts of irreparable damage and so on. Of course he is not so hampered and the issue is or should not be on rationale, but as to what, if anything, he has decided. Once his intent is clear, then it is a question of applying the normal principles of law to his action. Naturally the issue here is not the sole one possible; thus there may be a serious question whether a trial judge has granted merely a temporary restraining order which is not appealable or a temporary injunction which is. See, e. g., Connell v. Dulien Steel Products, Inc., 5 Cir., 240 F.2d 414, noted in 71 Harv.L.Rev. 550; Madison Shipping Corp. v. National Maritime Union, 3 Cir., 273 F.2d 955.

in, 2 Cir., 217 F.2d 936, rendered by a divided court.[4] It should be noted that there Judge Smith below had spoken rather decisively against the grant of an injunction, so that there was more support for the substance of the decision than here; but the language of the opinion spoke so decisively of wide appealability as not to carry assent; and two active circuit judges expressed their nonconcurrence in this approach when the case appeared later. Federal Glass Co. v. Loshin, 2 Cir., 224 F.2d 100. So even on the authorities relied on, the count would seem to have been far from decisive, as the two opinions herein tend to assume.[5]

Actually, however, there have been more lately a whole series of cases in this court, not noticed in the original majority opinion, which rather completely establish that the merely interlocutory rulings of an equity judge advancing the case on his calendar may not properly be considered either the grant or denial of an injunction. Thus see Greenstein v. National Skirt & Sportswear Ass'n, 2 Cir., 274 F.2d 430; Armstrong-Norwalk Rubber Corp. v. Local Union No. 283, 2 Cir., 269 F.2d 618; Marco v. Dulles, 2 Cir., 268 F.2d 192; Fleischer v. Phillips, 2 Cir., 264 F.2d 515, certiorari denied Fleischer v. Benjamin, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030. The two most recent (and unanimous) cases just cited are instructive in holding that an order granting a stay *pending arbitration*

in an action seeking injunction did nothing more—in the words of Judge Hand in the Armstrong-Norwalk case, supra, 2 Cir., 269 F.2d 618, 621—"than forbid the plaintiff from pressing its action pending the arbitration," which was "only a step in the action itself." And the other two cases dealt with orders refusing to disqualify attorneys in injunctive actions. The last case cited—the first of this group in point of time—refers to the wealth of precedents from other circuits.

Additionally a further substantial line of recent cases are definitely at variance with this result; they are cases where we have dismissed appeals for lack of final judgment which should have been held appealable as rulings on injunctions, had my brothers' present views been then accepted. They include Goldlawr, Inc. v. Heiman, 2 Cir., 273 F.2d 729; John & Sal's Automotive Service, Inc. v. Jones Beach State Parkway Authority, 2 Cir., 267 F.2d 862; Gauvreau v. United States Pictures, Inc., 2 Cir., 267 F.2d 861; Schwartz v. Eaton, 2 Cir., 264 F.2d 195; Cott Beverage Corp. v. Canada Dry Ginger Ale, 2 Cir., 243 F.2d 795. Since this is a question of jurisdiction, I think we must be as alert to sustain our jurisdiction as to deny it in a proper case; the failure of counsel to bring up the argument is not enough to deny it. Hence the confusion this ruling will make in our law is apparent; it is enhanced when we note the steady current of opposing deci-

---

4. Also cited is Telechron, Inc. v. Parissi, 2 Cir., 197 F.2d 757, which quite clearly is not apposite; for that dealt with two separate claims, a federal claim for patent infringement and a common-law or state claim for disclosure of confidential relations. So far apart had our court considered these claims that it would not even allow the state claim to be asserted in a federal court, see, e. g., Musher Foundation v. Alba Trading Co., 2 Cir., 127 F.2d 9; and it took a new statute granting federal jurisdiction over both these "claims," 28 U.S.C. § 1338(b), and the overruling in Parissi of a first restrictive decision to get this second claim even recognized federalwise. This history is set forth in my dissent in the overruled

case, Kleinman v. Betty Dain Creations, 2 Cir., 189 F.2d 546, 549–555. So dismissal of the separate nonpatent claim, with the finding of finality under F.R. Civ.P. 54(b), was obviously denial of an injunction as to it.

5. I doubt if Raylite Elec. Corp. v. Noma Elec. Corp., 2 Cir., 170 F.2d 914, is to be considered present authority, since admittedly it was decided at a date before extensive consideration of the issue had been had and in the Loshin case itself, its reconsideration was thought appropriate. And Judge Swan, who wrote the opinion, has shown himself amenable to majority view, as in Marco v. Dulles, 2 Cir., 268 F.2d 192, and Goldlawr, Inc. v. Heiman, 2 Cir., 273 F.2d 729.

sions in other circuits and in states following the federal rules.

The leading case is probably Judge Hastie's notable and often-cited decision in Morgenstern Chemical Co. v. Schering Corp., 3 Cir., 181 F.2d 160, the rationale of which has never been answered. See in accord Albert v. School Dist. of Pittsburgh, 3 Cir., 181 F.2d 690, 691; American Airlines v. Forman, 3 Cir., 204 F.2d 230; District 65, Distributive, Processing and Office Workers Union of New York and New Jersey v. McKague, 3 Cir., 216 F.2d 153; Wallace Products, Inc. v. Falco Products, Inc., 3 Cir., 242 F.2d 958; Division 689, Amalgamated Ass'n of Street, Electric Ry. and Motor Coach Employees of America, A. F. L. v. Capital Transit Co., 97 U.S.App.D.C. 4, 227 F.2d 19; John Thompson Beacon Windows, Ltd. v. Ferro, Inc., 98 U.S.App. D.C. 109, 232 F.2d 366, 369; Spruill v. Cage, 6 Cir., 262 F.2d 355; Packard Motor Car Co. v. Gem Mfg. Co., 7 Cir., 187 F.2d 65, certiorari granted 341 U.S. 930, 71 S.Ct. 803, 95 L.Ed. 1360, dismissed by stipulation 342 U.S. 802, 72 S.Ct. 92, 96 L.Ed. 607; Brandt v. Renfield Importers, Ltd., 8 Cir., 269 F.2d 14; Baltimore Contractors v. Bodinger, supra, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233; City of Morgantown, W. Va. v. Royal Ins Co., supra, 337 U.S. 254, 69 S.Ct. 1067, 93 L.Ed. 1347; Maybury v. City of Seattle, Wash., 336 P.2d 878, 881; Settem v. Etter, 236 Minn. 514, 53 N.W.2d 467; Smith v. Hamilton, 70 Nev. 212, 265 P. 2d 214; Bell v. Davis, Tex.Civ.App., 287 S.W.2d 733; F. & T. Development Co. v. Morris, Tex.Civ.App., 248 S.W.2d 233.

Some of these decisions specifically criticize the first Loshin case, e. g., the Division 689 and Maybury cases, as do also the text writers, 3 Barron & Holtzoff, Federal Practice & Procedure §§ 1241, 1242 (Wright Ed.); 6 Moore's Federal Practice 49–51, 2321 (2d Ed. 1953).[6] A diligent search has not uncovered any definite support for that holding in other circuits[7] or in states following the federal rules. Nor is it possible, in view of both the careful analysis and the specific holdings of these precedents, to push them aside on any attempted fragmentation of the issue of interlocutory appeals and the statute, 28 U.S.C. § 1292(a)(1). It is regrettable that our recent return to the Union is now to be repudiated without discussion of the weight of policy and precedent against that course.

The decisions indicate that nowhere else in the country is the issue of piecemeal appeals in such acute condition as here. Presumably it is due somewhat to the permeation of local practice, for New York is notorious for interlocutory appeals—a fact which is said to lead lawyers to choose the federal courts where available. Harper & Atwood, Civil Practice in the Federal Courts (Practising Law Institute, July 1956 Ed.) 1, 2. What we are doing is to invite a plethora of such appeals. Every motion day has numerous ones involving such questions as denials of leave to amend pleadings or refusals to quash service;[8] while most of these are quite properly (if somewhat inconsistently) denied, yet the burden remains. And more than occasionally an utterly inconsistent decision appears.[9]

6. This seems generally true of the law review comments on the case. 4 Buffalo L. Rev. 355; 68 Harv.L.Rev. 1278; 39 Minn. L.Rev. 921; 103 U. of Pa.L.Rev. 816; 7 Stanford L.Rev. 549.

7. Possibly it has support in a single case, International Forwarding Co. v. Brewer, 5 Cir., 181 F.2d 49, although the discussion (at an early date when only the Raylite opinion was available) is so summary that little can be deduced from it. It seems also partially supported in Judge Danaher's dissent in Division 689, Amalgamated Ass'n of Street, Electric

Ry. and Motor Coach Employees of America, A. F. L. v. Capital Transit Co., 97 U.S.App.D.C. 4, 227 F.2d 19, cited supra.

8. Thus three of such abortive appeals were dismissed at the last motion session in which I participated, together with my brothers MOORE and FRIENDLY.

9. An example in Goldlawr, Inc. v. Heiman, supra, 2 Cir., 273 F.2d 729, where after the court had denied its jurisdiction for lack of an appealable final judgment, Dec. 29, 1959, it proceeded on Jan. 18, 1960, to vacate the very judgment over

No wonder counsel are confused. Judge WATERMAN's unanswered dissent in this case states the correct course, and it is my earnest hope that it may be followed hereafter.

Of course assumption of nonexistent jurisdiction perhaps often does not do much harm except to add substantially to the burdens of an overburdened appellate court and to invite other such appeals. Thus attempted affirmance may perhaps amount to hardly more than an interim accolade to the trial judge. But often it may raise much more serious questions. Here it would seem we have such a case. For the court has assumed to issue a rather far-reaching injunction affecting substantial financial interests in a case where it lacks jurisdiction. It seems to me that the injunction must be held invalid; hence its potentialities of damage are extensive. A rehearing *in banc* would have afforded opportunity to settle some of these issues now left blind.

I am authorized to state that Judge WATERMAN concurs in this opinion.

FRIENDLY, Circuit Judge.

To Chief Judge LUMBARD and me, the four opinions already written would have seemed sufficient, even for the tangled problems in this and its companion case, United States v. New York. New Haven & Hartford R. Co., November 2, 1959: December 2, 1959; majority and concurring-dissenting opinions January 29, 1960. This is particularly true since the cases are now before the Supreme Court, which can review both the many substantive and procedural questions on which this Court was unanimous and the single procedural question, the appealability under § 1292(a)(1) of the refusal of the injunction in the New Haven stockholders' suit, as to which Judge WATERMAN dissented. Now we have a fifth opinion, on that point. We feel obliged to note that the course which has brought this to us would mean that any active judge may publish a dissent from any decision, although he did not participate in it and the Court has declined to review it *en banc* thereafter, a practice which seems to us of dubious policy especially since, if the issue is of real importance, further opportunities for expression will assuredly occur.[1] We would not have responded but for the assertions, unwarranted as we think, that our opinion left Judge WATERMAN's

---

which it had held it had no power. This is contrary to the settled view that the court must always note the absence of an appealable order whenever shown, and must cease further activity even though the parties are prepared to consent or waive the objection. See the many cases cited in the text of this dissent between footnotes 5 and 6. The cases cited in the second Goldlawr opinion appear not to be in point. Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800, and Rorick v. Board of Comm'rs of Everglades Drainage Dist., 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242, concerned only the proper routing for purposes of review of district court judgments which were actually quite final, i. e., the issue presented in the companion case herewith decided, namely, United States v. The New York, New Haven & Hartford R. Co. And In re Cook's Motors, 1 Cir., 142 F.2d 369, a case concededly of "peculiar circumstances" where trial admonition was superfluous—one not heretofore cited as defining appellate power—actually involved the settlement of claims against a bankruptcy estate under the admittedly broad federal jurisdiction in bankruptcy.

1. Despite our brother CLARK'S expressed belief "that in a proper case a panel of this court may frankly state its disagreement with a decision of another panel and refuse to be bound thereby," Dunbar v. Henry DuBois' Sons Co., Inc., 2 Cir., 275 F.2d 304, 306, we would favor what he characterizes as a "custom of intramural warnings of the approach of overruling opinions" so as to permit a request for an *en banc* before judgment is rendered. There was no occasion for such a warning here since neither the majority nor, as we read Judge WATERMAN'S opinion, the dissenter, thought we were doing this.

Although the vote against the *en banc* renders the point moot, we do entertain serious doubts whether, in the absence of any court rule or practice, an *en banc* may be ordered at the request of a judge not participating in the decision, made after judgment was rendered (although unavoidably so), when no request for this has been made by a party.

dissent unanswered and that we overlooked a series of cases in this Court which apparently are claimed to have overruled *sub silentio,* or at least to have undermined, the authority on which we relied.

The issue is the interpretation of the word "refusing" in 28 U.S.C. § 1292(a) (1) which, so far as here material, gives the courts of appeals jurisdiction over appeals from "Interlocutory orders of the district courts * * * refusing * * * injunctions."

The first problem to arise in this regard was whether denial of a motion by a plaintiff for summary judgment in a suit for an injunction on the ground that there was a triable issue of fact was an order "refusing" an injunction. In Raylite Electric Corp. v. Noma Electric Corp., 2 Cir., 1948, 170 F.2d 914, 915, a unanimous Court (Judges Learned Hand, Swan and Chase) held that it was. Two years later, in International Forwarding Co. v. Brewer, 1950, 181 F.2d 49, the Fifth Circuit held likewise in a case where a plaintiff's motion for judgment

on the pleadings in an injunction action had been denied. However, on the very same day, the Third Circuit, in Morgenstern Chemical Co. v. Schering Corp., 1950, 181 F.2d 160, reached a result opposite to ours in Raylite. In view of the able opinion there rendered by Judge Hastie, this Court reconsidered the question on a motion to dismiss the appeal in Federal Glass Co. v. Loshin, 2 Cir., 1954, 217 F.2d 936. The majority, Judges Learned Hand and Frank, adhered to the result reached in Raylite; Judge Clark dissented. No request was made for an *en banc.* Despite what was said when the Loshin case came before the Court on the merits, 1950, 224 F.2d 100, the issue was evidently deemed settled for this Circuit. For Judge Clark's opinion in the second Loshin case stated, at page 101, that "A resolution of these conflicts must ultimately come from the Supreme Court." [2] Neither the circumstance, not especially surprising, that the Third Circuit has followed its own Morgenstern decision nor the fact that this has attracted some following,[3] seemed to us to warrant

We do not read the remark in Western Pacific R. Case, 1953, 345 U.S. 247, 262, 73 S.Ct. 656, 97 L.Ed. 986, as to the court's power "to initiate en banc hearings *sua sponte,*" as independent of the Supreme Court's admonition, 345 U.S. at pages 260–261, 73 S.Ct. at page 663, "It is essential, of course, that a circuit court, and the litigants who appear before it, understand the practice—whatever it may be—whereby the court convenes itself en banc." This seems peculiarly applicable after judgment has been rendered and further appellate proceedings are about to be taken.

2. Of the judges in this Circuit who had considered the problem, four, Judges Learned Hand, Swan, Chase and Frank, had held that an order denying a motion for summary judgment by a plaintiff in an action for an injunction was appealable under § 1292(a) (1); two, Judges Clark and Medina, thought it was not.

3. Its following, at least in the Federal courts, is nothing like so great as the long list of citations would indicate. In Division 689 v. Capital Transit Co., 1955, 97 U.S.App.D.C. 4, 227 F.2d 19, 20, while both majority and minority referred to Morgenstern, the decision was that a mo-

tion to compel arbitration "is not an application for injunctive relief." This likewise was the holding in John Thompson Beacon Windows, Ltd. v. Ferro, Inc., 1956, 98 U.S.App.D.C. 109, 232 F.2d 366, which did not mention Morgenstern. Spruill v. Cage, 6 Cir., 1958, 262 F.2d 355, held denial of a defendant's motion, styled as one for summary judgment but held to be rather a motion to dismiss, in an action for a declaration of rights, was not a final decision appealable under § 1291; the opinion does not mention § 1292(a) (1); Morgenstern was included in a string citation along with 2d Circuit authority. Brandt v. Renfield Importers, Ltd., 8 Cir., 1959, 269 F.2d 14, involved the same dismissal-of-one-of-multiple-defendants problem as the 2d Circuit cases discussed in our opinion, at page 546; no reference was made to Morgenstern. This leaves Packard Motor Car Co. v. Gem Mfg. Co., 7 Cir., 1950, 187 F.2d 65, certiorari dismissed per stipulation, 1951, 342 U.S. 802, 72 S. Ct. 92, 96 L.Ed. 607. We have not examined the state cases, since the entire statutory and decisional background would have to be thoroughly explored and we do not deem this warranted on a question of federal appellate jurisdiction.

reexamination of a matter that had already received such thorough consideration from distinguished members of this Court,—particularly since the consequences predicted in the dissent in the first Loshin case had in no way materialized.[4]

Moreover, as pointed out in our opinion, the issue here was not that on which this Court and the Third Circuit have disagreed but one where we deem the case for appealability to be stronger. Is a district judge's dismissal of a count of a complaint for an injunction resting on a claim of violation of a Federal statute separate from any other claim to be denied recognition as a "refusal" of an injunction because some day the same or another judge might or might not grant an injunction on another count raising wholly distinct legal questions? To us a negative answer seems obvious; we think this would have been clear to everyone if the stockholders' suit had been all that stood between the New Haven and the $10,000,000 expenditure sought to be prevented and plaintiffs had pressed the allegation of Interstate Commerce Act violation as the only one sufficiently strong to afford a prospect of temporary relief. Indeed, we gather our brother CLARK would agree that an order denying such a temporary injunction would have been appealable under § 1292(a)(1). But, as pointed out by Judge Frank in Federal Glass Co. v. Loshin, 217 F.2d at page 938, a rule differentiating as to appealability between temporary and final injunctions would be "sheer ritualism."[5]

It is not surprising, therefore, that the differences of opinion in this Circuit as to appealability of the denial of summary judgment in an action for an injunction had not previously spilled over to the problem here presented. In Tele-chron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757, a unanimous court (Judges Swan, Clark and Frank) upheld the appealability of an order excising unfair-competition language from a complaint for an injunction which also alleged a federal claim.[6] We are now told this decision is not apposite; but the asserted reason, that the excised claim was far apart from the one remaining, seems unrelated to the issue. Surely we are not to read § 1292(a)(1) as if it said "refusing an injunction, unless some ground for injunction remains, unless that ground is far apart."

Neither the persuasiveness nor the authority of the decisions in Loshin and Telechron is in any way challenged by the four cases which are cited as establishing that merely interlocutory rulings of an equity judge advancing a case on his calendar may not properly be considered as either the grant or the denial of an injunction. We are in full accord with this proposition, but its very statement suffices to show how far it and the cases relied on are from the issue here. Three elements are required for appealability under § 1292(a)(1) as here applied: (1) The order must be "interlocutory"; (2) it must "refuse"; and (3) what is refused must be an "injunction." Our question, like Raylite, Loshin and Telechron, related to the second element; the cases cited concerned the third. Armstrong-Norwalk Rubber Corp. v. Local Union No. 283, 2 Cir., 1959, 269 F.2d 618 and Greenstein v. National Skirt & Sportswear Assn., 2 Cir., 274 F.2d 430, applied the rule, laid down by the Supreme Court in Baltimore Contractors, Inc. v. Bodinger, 1955, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233, that an order granting or denying a stay of an action pending arbitration would be

4. Neither Chief Judge LUMBARD nor I recall a single appeal of this sort at the present Term.

5. We would suppose also that denial of a temporary injunction for want of sufficient showing of irreparable injury would be appealable, even if the judge gave plaintiff leave to renew on a more adequate showing, although it could be argued there at least as forcefully as here that the judge had not yet "refused" an injunction.

6. A footnote (at page 759) cites " * * * Raylite Electric Corp. v. Noma Electric Corp., 2 Cir., 170 F.2d 914, 915. Cf. Morgenstern Chemical Corp. v. Schering Corp., 3 Cir., 181 F.2d 160."

deemed an "injunction" only if the action sought to be stayed would have been an action at law before the fusion of law and equity. Fleischer v. Phillips, 2 Cir., 1959, 264 F.2d 515, certiorari denied 1959, 359 U.S. 1002, 79 S.Ct. 1139, 3 L. Ed.2d 1030, followed in Marco v. Dulles, 2 Cir., 1959, 268 F.2d 192, related to orders refusing to disqualify an attorney. The important question discussed and decided was whether the orders were within the class appealable as final under 28 U.S.C. § 1291 pursuant to Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528. So far as concerns § 1292(a)(1), the ruling was merely that (p. 516 of 264 F.2d) "The real and only bite to each motion is the attempt to secure the exclusion of the lawyers from the case; and once disqualification is obtained, all else is superfluous. Hence the prayers for injunctive relief add nothing to the orders denying the motions and render neither of them automatically appealable under 28 U.S.C. § 1292(a)(1)." In other words, an "injunction" had not been refused.[7]

We do not assert our reading of § 1292(a)(1) is the only possible one. However, we think this comports best not only with the language of the statute, but also with its reason and its history. Orders refusing injunctions are important orders—important not only to the litigants but often, as here, to the public. The need for prompt review arises from the very nature of an injunction, a remedy whose grant or refusal may result in an injury beyond possibility of repair. Congress recognized this when it subjected to review not only interlocutory

orders "granting" or "refusing" injunctions but orders "continuing" or "modifying" them. To say that nothing was determined by Judge McGohey's order denying the stockholder's claim of Interstate Commerce Act violation seems to us legal theorizing unrelated to the facts. To be sure, the District Judge might have required the stockholders to present all their counts relating to the challenged transaction at one time but, for entirely sufficient reasons, he did not do so. We assure our brother CLARK that, having long practiced in New York, we have no desire to see 28 U.S.C. § 1292 modified, either by legislation or by interpretation, to parallel the provisions as to appeal from non-final orders contained in § 609 of the New York Civil Practice Act—or to come near that. But § 1292 is as much a part of the Judicial Code as § 1291; the provision, now in § 1292 (a)(1), with which we are here concerned, was enacted in 1895, 28 Stat. 666, because the implications of "the lack of all review over the action of a single judge in denying interlocutory injunctions" "had not been adequately considered" in the Evarts Act of 1891, 26 Stat. 826, Frankfurter and Landis, The Business of the Supreme Court, 108–09; after limiting the section to the grant or continuing of an injunction in 1900, 31 Stat. 660, Congress restored its former breadth in § 129 of the Judicial Code of 1911, 36 Stat. 1134; and the need for still further expansion of appeals from interlocutory orders was demonstrated by the enactment of § 1292(b) in 1958, 72 Stat. 1770. It is not for us to put personal predilections on appealability above the Congressional will.[8]

7. Judge CLARK also cites the cases, fully considered in our original opinion at page 546, where the Court has dismissed appeals that were argued to be properly before it as from final judgments under 28 U.S.C. § 1291 and no contention was made with respect to appealability under 28 U.S.C. § 1292(a) (1). Apart from other factors distinguishing most of these cases, it has been clear since Chief Justice Marshall's statement in United States v. More, 1805, 3 Cranch 159, 7 U.S. 159, 172, 2 L.Ed. 397, that

courts do not consider themselves bound by the exercise of jurisdiction where "no question was made" and the issue "passed sub silentio,"—a fortiori by the failure to exercise it.

8. We see no occasion to discuss our brother CLARK'S observations in footnote 9 with respect to the unanimous action taken on January 18, 1960, in Goldlawr v. Heiman, 2 Cir., 273 F.2d 729, except to say that we are unable to follow the distinction of the Supreme Court cases

Chief Judge LUMBARD joins in this opinion. Judge MOORE, not having participated in the decision, deems it inappropriate that he comment as to the merits; however, he joins us in considering that an *en banc* should not have been granted here and also in regretting inauguration of a practice of writing opinions with respect to an *en banc* vote.

there cited on the ground that they related to final judgments, since the defect in them as in Goldlawr was lack of appellate jurisdiction. We therefore cannot agree that an appellate court lacks power to preserve the substantial rights of the parties when an appeal has been taken to the wrong court by excusable error.